The **DELTA QUEEN STEAMBOAT COMPANY**, Plaintiff–Appellee,

v.

**DISTRICT 2 MARINE ENGINEERS BENEFICIAL ASSOCIATION, ASSOCIATED MARITIME OFFICERS, AFL–CIO and Philip Ritchie, Defendants–Appellants.**

No. 89–3084.

United States Court of Appeals,
Fifth Circuit.

Dec. 5, 1989.

Joel C. Glanstein, O'Donnell & Schwartz, New York City, William Lurye and Louis Robein, Gardner, Robein & Urann, Metairie, La., for defendants-appellants.

Daniel Lund and A. Gordon Grant, Jr. Montgomery, Barnett, Brown, Read, Hammond & Mintz, New Orleans, La., for plaintiff-appellee.

Before DAVIS and SMITH, Circuit Judges, and LITTLE, District Judge.[1]

JERRY E. SMITH, Circuit Judge:

This labor arbitration dispute arose as a consequence of a near collision between a commercial passenger vessel and a tow of river barges while navigating upstream through a dangerous channel of the Mississippi River. We are asked to decide whether a labor arbitrator exceeded his contractual authority by ordering the reinstatement to full employment of the responsible riverboat captain. Concluding that the district court properly vacated that portion of the arbitrator's award requiring reinstatement, we affirm.

## I.

Captain Philip Ritchie, a forty-year veteran of the merchant marine service, joined the crew of the MISSISSIPPI QUEEN on April 24, 1987, to serve as a pilot. The Delta Queen Steamboat Company ("Delta Queen") owned and operated several passenger excursion vessels, including the MISSISSIPPI QUEEN, upon the Mississippi River. One month after joining the crew, Ritchie was piloting the MISSISSIPPI QUEEN north toward Memphis with over 350 passengers on board. Near a location known as Mason's Landing, sandbars reduced navigable lanes to a chokepoint. The current through the channel was swift, making navigation hazardous.

Northbound traffic stalled behind a large tow of barges attached to the towboat HARRY MACK, which, piloted by Captain Clark, was hauling a tow of 34 barges, 1,400 feet in length and 210 feet in width. Captain Clark was unable to force his tow through the chokepoint against the swift currents; when the MISSISSIPPI QUEEN arrived near Mason's Landing, the HARRY MACK was awaiting the assistance of other towboats to provide additional power.

Ritchie radioed the HARRY MACK, seeking permission, as required by the inland navigational rules, to overtake the barges.[2] Clark informed Ritchie that his position in the narrow channel was unstable and that it would be unsafe for the MISSISSIPPI QUEEN to overtake the barges. However, pressured by time, Ritchie elected to attempt a port-side pass without the express permission of the HARRY MACK.

---

1. District Judge of the Western District of Louisiana, sitting by designation.

2. Rule 13 of the Inland Navigational Rules Act of 1980, 33 U.S.C. § 2013(a), for example, provides that "any vessel overtaking any other shall keep out of the way of the vessel being overtaken." Rule 9, *id.* § 2009(e)(i), provides that "[i]n a narrow channel or fairway when over-taking, the vessel intending to overtake shall indicate her intention by sounding the appropriate signal prescribed in Rule 34(c) and take steps to permit safe passing. The overtaken vessel, if in agreement, shall sound the same signal. If in doubt she shall sound the danger signal...."

Under full power, the MISSISSIPPI QUEEN lost headway in the swift current. The situation degenerated quickly as Ritchie lost complete control of the vessel and spun toward the barges. Ritchie sounded the danger signal, whereupon Clark reversed his engines. The bow of the MISSISSIPPI QUEEN, caught in a 360-degree spin, missed colliding with the barges by only about fifteen feet; Ritchie finally regained control downstream in calmer water. No damage or injuries were reported. Ritchie continued to serve his rotations as pilot until the MISSISSIPPI QUEEN's return, about eight days later, to its homeport in New Orleans.

There, a Delta Queen representative informed Ritchie that his employment with the company was being terminated because of the near miss. This verbal notice was confirmed in writing shortly thereafter.[3] The Marine Engineers Beneficial Association, District 2 ("the union"), filed a grievance with the company on behalf of Ritchie the following day, and the matter proceeded to arbitration pursuant to the applicable collective bargaining agreement.[4]

The company maintained that Ritchie was discharged in accordance with article VI of the collective bargaining agreement, which in relevant part provides, "No Officer shall be discharged except for *proper cause* such as, but not limited to, inefficiency, insubordination, *carelessness*, or disregard of the rules of the Company" (em-

phasis added). The arbitrator found that Ritchie was indeed "grossly careless" in his professional judgment but also concluded that Ritchie was the victim of disparate company discipline. He cited three prior MISSISSIPPI QUEEN mishaps—some involving substantial damage[5]—as to which the responsible pilots suffered no disciplinary action. The arbitrator felt that it would be unfair, in light of Ritchie's forty years of untarnished maritime service, for the company to impose the draconian measure of termination. Accordingly, the arbitrator awarded Ritchie reinstatement as a Delta Queen pilot, restoration of lost seniority, and most of his back pay.[6]

Delta Queen appealed the arbitrator's decision to the district court pursuant to 29 U.S.C. § 185, challenging the contractual authority of the arbitrator to award reinstatement while, inconsistently, finding that Ritchie was grossly careless. The company asserts that the arbitrator, having found gross carelessness, is foreclosed from awarding a remedy at odds with the company-imposed discipline. To reinforce its position, Delta Queen points to article V(a) of the collective bargaining agreement, which states, "The right to discipline and discharge for proper cause are [sic] likewise the *sole responsibility of the Company*" (emphasis added). The district court agreed with the company and granted summary judgment in its favor, vacating the arbitrator's decision to reinstate Ritchie. The union appeals, believing that the feder-

---

3. The company's June 1, 1987, termination letter provided as follows: "Enroute to Memphis on May 21, 1987 at about 7:00 AM you *overtook and passed* a towboat in a hazardous stretch of the river. In doing so, you violated the applicable Rules of the Road. This act put the Mississippi Queen in danger. It compromised the safety of her passengers and crew. This is the cause of your termination" (emphasis in original).

4. The collective bargaining agreement that applies in this case became effective on July 1, 1986, and expired on March 1, 1988. For reasons unknown, the arbitrator cited language from an earlier agreement that expired on April 1, 1986—one year prior to the relevant events of this case. The confusion is irrelevant, as Ritchie's conduct was egregious enough to be "grossly careless" and thereby "proper cause" to discharge the Captain under *either* agreement.

5. One of the prior incidents involved a collision between the MISSISSIPPI QUEEN and the CRIMSON GLORY on December 12, 1985, that resulted in over $1,000,000 in damage.

6. On August 4, 1988, the labor arbitrator sustained in principal part the union's grievance and found the following:

I. Captain Philip Ritchie was guilty of 'gross carelessness' by his violation of the applicable Rules of the Road.

II. Captain Philip Ritchie was the victim of disparate treatment which requires setting aside the discharge.

III. Captain Philip Ritchie was not denied due process.

The Company shall immediately reinstate Captain Philip Ritchie to full employment and restore all lost seniority [and most back pay].

al court erroneously interfered with the arbitral process.

## II.

■ Judicial review of arbitration awards is extremely limited. So long as the arbitrator's decision "draws its essence from the collective bargaining agreement" and the arbitrator is not fashioning "his own brand of industrial justice," the award cannot be set aside. *United Paperworkers Int'l Union v. Misco, Inc.,* 484 U.S. 29, 36, 108 S.Ct. 364, 370, 98 L.Ed.2d 286 (1987) (quoting *United Steelworkers of Am. v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960)). However, federal courts are free to scrutinize the award to ensure that the arbitrator acted in conformity with the jurisdictional prerequisites of the collective bargaining agreement. *Container Prods., Inc. v. United Steelworkers of Am.,* 873 F.2d 818, 820 (5th Cir.1989). Where an arbitrator exceeds his contractual authority, vacation or modification of the award is an appropriate remedy. *Id.; see also* 9 U.S.C. § 10(d) (district court may vacate award where arbitrator exceeds his power).

■ Thus, while an arbitrator's decision is accorded considerable judicial deference to the extent it touches the merits of the controversy, his jurisdiction nevertheless is shaped by the underlying collective bargaining agreement. *See Enterprise Wheel & Car Corp.,* 363 U.S. at 597, 80 S.Ct. at 1361 (if arbitrator is unfaithful to collective bargaining agreement, award will not be enforced by courts). He may look beyond the written contract when interpreting a collective bargaining agreement if the instrument is ambiguous or silent upon a precise question. *Manville Forest Prods. Corp. v. United Paperworkers Int'l Union,* 831 F.2d 72, 75 (5th Cir.1987). However, where the arbitrator exceeds the express limitations of his contractual mandate, judicial deference is at an end. Thus, since this jurisdictional challenge focuses upon whether the award is grounded in the bargaining agreement, we will review the district court's decision *de novo. Accord HMC Management Corp. v. Carpenters Dist. Council,* 750 F.2d 1302, 1304 (5th Cir.1985) (independent review of district court's ruling that award not grounded in bargaining agreement).

## III.

### A.

■ Federal law encourages private resolution of labor disputes through arbitration. However, the company and union may limit the discretion of the arbitrator in the collective bargaining agreement. *Misco,* 484 U.S. at 37–38, 108 S.Ct. at 370–71. By so doing, it is possible to vest in the employer complete discretion over terminations which the arbitrator is not free to usurp. *See Bruno's, Inc. v. United Food & Commercial Workers Int'l Union,* 858 F.2d 1529 (11th Cir.1988) (vacating portion of arbitrator's decision that was within province of employer). In fact, in *Enterprise Wheel & Car Corp.,* the Court announced the following limit upon arbitral authority:

> [A]n arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement.

363 U.S. at 597, 80 S.Ct. at 13.

We have interpreted Supreme Court jurisprudence as requiring vacation of arbitral decisions that reinstate discharged employees when such arbitral action is deemed to be an ultra vires act. In *Container Products,* the arbitrator reinstated a discharged employee to "promote good labor relations," although the collective bargaining agreement reserved disciplinary decisions for the company. As in the case before us, the arbitrator failed to make a specific finding of "just cause" for discipline although, inconsistently, he noted that the employee had no good reason to refuse to work. The court held that the arbitrator made an "implicit finding of just cause for dismissal," 873 F.2d at 820, and that consequently, the arbitrator had no

jurisdiction under the collective bargaining agreement to assess an alternative remedy or impose an individually-tailored modification to the punishment.[7]

Several of our sister circuits similarly have declined to respect arbitral decisions that conflict with the underlying collective bargaining agreement. In *Bruno's*, for example, the court focused upon an arbitrator's power to fashion a new disciplinary policy for an employer. There, an employee had been terminated for violating company procedure. The court vacated a portion of the arbitrator's decision that had established new operating procedures, because such rulemaking conflicted with his jurisdictional authority under the bargaining agreement, which vested the employer with unfettered discretion over its own rules and operating procedures. In vacating part of the arbitrator's award, the court held that the arbitrator "may not create a new rule to replace one he strikes down as unreasonable." 858 F.2d at 1532. Specifically, the employer reserved onto itself such authority, which barred the arbitrator from fashioning his own "improved" rules.[8]

### B.

Delta Queen presents three arguments seeking vacation of the arbitrator's decision to reinstate Ritchie. First, the collective bargaining agreement in effect at the time Ritchie was fired limited the arbitrator's jurisdiction to the issue of whether "proper cause" existed for company discipline. Having found "gross carelessness," the arbitrator impliedly found proper cause as defined in the agreement and, accordingly, he was divested of further jurisdiction over the matter. Any subsequent disciplinary decision became the sole responsibility of Delta Queen.

Second, the company argues that the arbitrator gratuitously—and erroneously—found disparate treatment in company discipline over a period of time covered by materially different collective bargaining agreements, contracts which do not lend themselves to fair comparison. Specifically, any inconsistency in punishment is the result of differences between an expired, pro-union collective bargaining agreement and a later agreement that made employee discipline easier to effect.[9] Third, Delta Queen suggests that the reinstatement of Ritchie would violate important public policy interests, namely, ensuring that competent pilots having sound discretion are in charge of the lives of the passengers and crew on board its vessels.[10]

The union argues that the arbitrator, never having found "proper cause" ex-

---

**7.** *See also HMC Mgmt. Corp.* (arbitrator's decision to reinstate discharged employee remanded because, having found just cause, he exceeded his contractual authority by modifying discipline).

**8.** Similarly, the Sixth Circuit has been intolerant of ultra vires acts of labor arbitrators. *See, e.g., International Bhd. of Elec. Workers, Local 429 v. Toshiba Am., Inc.*, 879 F.2d 208, 210–11 (6th Cir.1989) (arbitrator lacked authority under collective bargaining agreement to reinstate discharged employees who stipulated that they had violated agreement's no-strike clause); *Magnavox Co. v. International Union of Elec., Radio & Mach. Workers*, 410 F.2d 388, 389 (6th Cir.1969) (arbitrator lacked authority to reinstate employee after finding that just cause existed for discharge and where sole responsibility for discipline rested with employer).

**9.** Article VI of the collective bargaining agreement in effect between the company and the union at the time of the prior MISSISSIPPI QUEEN mishaps provided that a riverboat captain could be discharged for "gross or *repeated*

carelessness, or willful disregard of the rules of the Company" (emphasis added). Delta Queen suggests that this version required a pattern of misconduct, as carelessness had to be repeated (unless "gross"). In contrast, the agreement in effect at the time of this mishap dropped the word "repeated," making discipline available based upon a single event.

**10.** Federal courts are not compelled to enforce arbitration awards that are contrary to well-defined public policy. *See Misco*, 484 U.S. at 42, 108 S.Ct. at 3; *W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber, Cork, Linoleum & Plastic Workers of Am.*, 461 U.S. 757, 766, 103 S.Ct. 2177, 2183, 76 L.Ed.2d 298 (1983). The public policy exception, although narrow, has been used by this court previously to vacate an arbitrator's decision to reinstate a truck driver who drank while on duty. *Amalgamated Meat Cutters & Butcher Workmen v. Great Western Food Co.*, 712 F.2d 122, 125 (5th Cir.1983). Because we conclude that this appeal turns upon the contractual authority of the labor arbitrator, we decline to address this public policy issue.

pressly, did not exceed his "broad" jurisdictional powers when he reinstated Ritchie. More accurately, the arbitrator was free to inject disparate company treatment into the calculus of whether "proper cause" existed. According to the union, a finding of "gross carelessness" does not foreclose the inquiry or terminate the analysis. Since the arbitrator did not make the necessary finding of proper cause for discipline, reinstatement was appropriate under the collective bargaining agreement, because the company never had the option to impose employee punishment.

### C.

■■■ We conclude that this court's recent pronouncement in *Container Products* controls the resolution of this case. We agree with the company that the rule in this circuit, and the emerging trend among other courts of appeals, is that arbitral action contrary to express contractual provisions will not be respected. That being so, we find that the collective bargaining agreement in effect between Delta Queen and the union proscribed the arbitrator from reinstating the discharged employee in this case.

We understand the plain language of article VI of the agreement to confer upon the arbitrator the authority to determine whether there is "proper cause" for discipline because of employee carelessness. If proper cause exists, article V shifts sole responsibility for disciplinary action to management. In this case, the arbitrator found "gross carelessness" without finding "proper cause" for discipline.[11] Contrary to what the union suggests, the lack of an express finding is immaterial here.

As this court concluded in *Container Products*, should the arbitrator "implicitly find" that proper cause exists, he need not recite the operative phrase "proper cause." 873 F.2d at 820 (agreement in that case used phrase "just cause"). The phrase carries no talismanic significance in labor jurisprudence. It is simply a term of art that defines the many unrelated, indepen-

dent acts that serve as grounds for employee discipline under the agreement. If a collective bargaining agreement defines "proper cause" to include a nonexhaustive list of offenses, an arbitrator cannot ignore the natural consequence of his finding that a listed offense was committed. To hold otherwise would allow arbitrators to shape employee discipline, in agreements where discipline is reserved to management, because an arbitrator declines to chant certain operative words. We have not previously injected such formulation into labor arbitration, and we decline to do so here. Thus, where an arbitrator fails to make an express finding of proper cause, he nevertheless will be so bound if he finds that the employee committed certain underlying acts that constitute proper cause under the collective bargaining agreement.

### D.

In summary, we conclude that the arbitrator, having found Ritchie grossly careless, impliedly found proper cause for discipline. That being so, the arbitrator was without authority, under the bargaining agreement, to reinstate Ritchie. The district court properly vacated that portion of the arbitral award requiring reinstatement and, accordingly, we AFFIRM.

---

**11.** Under the collective bargaining agreement, the arbitrator needed only to find "carelessness" and not "gross carelessness" for the company to impose employee discipline.