**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 98-10273
(Summary Calendar)

INTERNATIONAL UNION OF
OPERATING ENGINEERS, LOCAL 351,

Defendant-Appellant.

versus

COOPER NATURAL RESOURCES, INC.,

Plaintiff-Appellee.

Appeal from United States District Court
for the Northern District of Texas

January 11, 1999

Before KING, BARKSDALE and STEWART, Circuit Judges.

CARL E. STEWART, Circuit Judge.

The International Union of Operating Engineers ("IUOE" or the "union"), through its Local 351, defendant in a lawsuit brought pursuant to the Labor Management Relations Act of 1947, 29 U.S.C. §§ 185(a), (c) (1994) ("LMRA"), appeals an order of the district court vacating an arbitration award in its favor. Cooper Natural Resources, Inc. ("Cooper Natural") brought suit under the LMRA after a dispute between it and the IUOE had been submitted to arbitration; since the arbitration involved the construction of a contract between an employer and a labor organization, the district court was authorized to evaluate the arbitrator's decision. Pursuant to that review, the

District Court for the Northern District of Texas found that the arbitration, which concerned a disciplinary action against an employee union member, was deficient in several respects. As such, the district court granted summary judgment in favor of Cooper Natural and vacated the award. We conclude that the award should indeed be vacated and thus AFFIRM the district court in all respects.

## I. FACTS AND PROCEDURAL HISTORY

Cooper Natural produces sodium sulphate, a mineral commonly used in detergents and in the manufacture of wood pulp, at a facility in Seagraves, Texas. The manufacture of sodium sulphate is an inherently dangerous industry; thus, Cooper Natural has an extensive safety policy for its employees. Cooper Natural trains its employees thoroughly in the proper conduct of their duties to ensure that accidents do not occur. Since 1971, Cooper Natural's employees have been represented by the IUOE. In 1993, Cooper Natural and the IUOE negotiated a new collective bargaining agreement ("CBA") to replace one which had been in place for some years;[1] this 1993 CBA incorporated by reference an alcohol and drug policy to which the parties had agreed in 1992. The IUOE's members ratified the 1993 CBA; pursuant to the CBA, the employees agreed, *inter alia*, to submit to periodic, random drug tests.

These drug screening tests took place during physical examinations of employees; if the test disclosed that an employee's use of controlled substances might be detrimental to the employee or to fellow employees at the plant, Cooper Natural reserved the right under the CBA "to make such

---

[1] In December 1996, Cooper Natural purchased the assets of Ozark-Mahoning Company ("Ozark-Mahoning"), a subsidiary of Elf Atochem North America, Inc. The CBA and the alcohol and drug policy at issue in this lawsuit were negotiated by Ozark-Mahoning, but it remained in effect after the sale to Cooper Natural. Thus, for convenience's sake, references in this opinion will be to Cooper Natural throughout.

2

adjustments in the employee's status as are found necessary to correct the situation."[2] At one such random screening, conducted during an annual physical, Elvin Gates, a member of Local 351, tested positive for barbiturates.[3] At the time of this physical in 1996, Gates occupied the job of chiller operator at the Seagraves plant, and his duties included the operation of a mechanical refrigeration system charged with anhydrous ammonia. Anhydrous ammonia, a hazardous substance regulated by the Occupational Health & Safety Administration, could seriously harm the operator of the refrigeration system as well as others around the system if the ammonia is handled improperly. Gates explained his positive test as resulting from his severe headaches, which led to his taking his wife's prescription medication containing barbiturates to relieve them.[4]

As a result of the positive test, Cooper Natural decided to discharge Gates. After notification that he was to be released, the IUOE intervened on Gates's behalf, and the union and Cooper Natural negotiated a Last Chance Agreement (the "agreement" or "LCA") whereby Gates's discipline would be reduced. Pursuant to this agreement, Gates was allowed to continue his employment as a chiller

---

[2] The CBA also provided that any action taken by Cooper Natural resulting from a drug screen would not be subject to the grievance procedures set forth in the CBA.

[3] Gates was informed at the outset of his physical that the examination would include a drug screening; before the physical ever began, Gates signed a consent form authorizing collection of a urine specimen for purposes of the screen.

[4] Although Gates contended at the arbitration, and the arbitrator so found, that he was unaware that his wife's medication contained barbiturates, the IUOE presented no summary judgment evidence in support of this contention.

In its briefs before this court, the IUOE again simply asserts that Gates was unaware that he was taking barbiturates when he medicated himself using his wife's physician-prescribed controlled substances. Cooper Natural would have us affirm the district court on the ground that the IUOE cannot introduce on appeal evidence which it did not tender at summary judgment, but we do not consider the IUOE's unsupported assertion that Gates failed to realize what he was doing to be "new evidence." As nothing more than an argumentative conclusion, we decline to affirm on that ground.

3

operator, but with loss of pay for the time he was off work (a few weeks) during the dispute. In exchange for this "last chance," Gates agreed (1) to abstain from using drugs in derogation of the drug policy; (2) to submit to whatever testing was deemed necessary by Cooper Natural for a period of no less than twelve months; and (3) that his failure to comply with either promise would subject him to immediate termination.

Almost immediately after execution of the agreement, Gates and the IUOE filed a grievance requesting that the LCA be set aside. Cooper Natural denied the grievance, and the union thereafter submitted the matter to arbitration. Under the CBA, the arbitrator's sole function was to determine whether Cooper Natural or the union was correct with reference to the proper application and interpretation of the CBA. The arbitrator did not have any authority to change, modify, amend, or supplement the CBA.

At the arbitration, the union conceded that Gates had taken barbiturates and tested positive on the random drug screen. The IUOE nevertheless argued that Gates should not have been disciplined at all because he lacked notice of the drug policy.[5] In response, Cooper Natural introduced into evidence two memoranda that reflected that it had given copies of its drug policy to all employees when the 1992 policy was enacted and incorporated into the CBA.[6] Notwithstanding this evidence, the arbitrator held that, because the drug policy was not physically attached to the memoranda introduced into evidence, Cooper Natural failed to show that Gates had notice of the

_____

[5] As with Gates's assertion that he took the barbiturates accidentally, the union did not seek to demonstrate via recourse to anything other than the bald assertion that Gates was unaware of Cooper Natural's drug policy.

[6] Gates had been employed at the plant since January 1982, rising to the level of chiller operator sometime before 1996. At all times, Gates was represented by the union, and he ratified the 1993 CBA.

4

policy. As a result, the arbitrator sustained the grievance and ordered that the LCA be set aside and that Gates be made whole in all respects.

The district court acknowledged at the outset of its review that its ability to overturn an arbitrator's award was limited; as long as the arbitrator's award "draws its essence from the CBA" and is not merely the arbitrator's "own brand of industrial justice," the district court conceded, the award must be affirmed. See Memorandum Opinion of District Court at 6 (quoting United Paper Workers Int'l Union v. Misco, Inc., 484 U.S. 29, 36 (1987)). The court held that this award, however, was deficient because it was contrary to express contractual provisions. The district court ruled that whether Gates had notice of the drug policy was not an interpretation issue for the arbitrator to determine and that the arbitrator "usurped the ability of the parties to settle their own dispute" by implementing a remedy that was unsupported by the LCA. Mem. Op. at 7. Consequently, the district court vacated the arbitrator's decision to set aside the LCA and granted summary judgment in favor of Cooper Natural.

## II.    DISCUSSION

We exercise de novo review of the grant of a summary judgment. See Boyd v. State Farm Ins. Cos., 158 F.3d 326, 328 (5th Cir. 1998). Summary judgment shall be entered in favor of the moving party if the record, taken as a whole, "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

*A.     Gates had notice under the CBA that a drug policy circumscribed his actions.*

Review of arbitration awards is, of course, strictly limited. See Delta Queen Steamboat Co. v. District 2, Marine Eng'rs Beneficial Ass'n, 889 F.2d 599, 604 (5th Cir. 1989), *cert. denied*, 498

U.S. 853 (1990); see also United Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593, 597 (1960) (finding that an arbitration award "is legitimate only so long as it draws its essence from the collective bargaining agreement"). Nonetheless, we conclude that the district court's review was appropriate as to the question whether Gates had notice of the drug policy; the arbitrator's finding to the contrary ignored the plain language of the contract and involved his engaging in just the sort of "industrial justice" that the Supreme Court has proscribed. See Misco, 484 U.S. at 36; see also Delta Queen, 889 F.2d at 604 ("[T]he rule in this circuit . . . is that arbitral action contrary to express contractual provisions will not be respected.").

In the case at bar, the IUOE does not dispute that Gates ratified the 1993 CBA. Consequently, there can be no genuine issue of material fact as to whether the drug policy, which was explicitly incorporated into the CBA, bound Gates and all other employees at the plant. The arbitrator's protracted discussion concerning whether Gates had notice of the drug policy was not an issue open to interpretation under the CBA. To hold, as the arbitrator did, that Gates had no notice of the policy, leads to the unwarranted conclusion that Gates had no notice of an agreement, the 1993 CBA, that he ratified, presumably after reading it. As the district court also found, the arbitrator simply did not have the authority to ignore the parties' agreement in fashioning a remedy, see S.D. Warren Co. v. United Paper Workers Int'l Union, 845 F.2d 3, 8 (1ˢᵗ Cir.), *cert. denied*, 488 U.S. 992 (1988), because an award that is contrary to express contractual provisions cannot be sustained. See Bruce Hardwood Floors v. UBC, Southern Council of Indus. Workers, Local 2713, 103 F.3d 449, 452 (5ᵗʰ Cir.), *cert. denied*, ___ U.S. ___, 118 S. Ct. 329 (1997).

In addition, even if we were somehow to conclude that ratifying the 1993 CBA, which incorporated the 1992 drug policy, did not constitute notice to Gates, we are loathe to accept the

6

arbitrator's reasoning. It defies credulity to conclude that Gates did not have notice because the memorandum adduced as evidence by Cooper Natural—a memorandum whose sole purpose was to discuss the alcohol and drug policy—failed to attach a copy of the drug policy. Furthermore, Gates consented to have his urine sampled at his annual physical after being informed that the sample was to be used in a random drug screen. This action constituted effective notice to Gates that a drug policy existed.

*B.    The Last Chance Agreement superseded the CBA with respect to Gates.*

The second consideration which leads us to set aside the arbitrator's award is actually one of more import for this circuit. When Cooper Natural and the union entered into the LCA, reducing Gates's punishment for failing the drug test, the parties formed a binding contract pursuant to the CBA which was entitled to enforcement by the arbitrator as "the parties' chosen means of dispute resolution." Bakers Union Factory No. 326 v. ITT Continental Baking Co., Inc., 749 F.2d 350, 354 (6th Cir. 1984). The LCA must be thought of as a supplement to the CBA and is just as binding upon the arbitrator. This has been the rule in three of our sister circuits, and we adopt it today as the governing law for this court. Cf. Coca-Cola Bottling Co. v. Teamsters Local No. 688, 959 F.2d 1438, 1440 (8th Cir.), *cert. denied*, 506 U.S. 1013 (1992); Ohio Edison Co. v. Ohio Edison Joint Council, 947 F.2d 786, 787 (6th Cir. 1991); Tootsie Roll Indus., Inc. v. Local Union No. 1, 832 F.2d 81, 84 (7th Cir. 1987).

According to the reasoning we herein adopt, an arbitrator ignoring the explicit terms of a last chance agreement is owed no deference, and his award must be closely scrutinized. This seemingly harsh rule is necessary because last chance agreements constitute formal contractual settlements of labor disputes. See Bakers Union Factory, 749 F.2d at 356. Since LCAs follow collective bargaining

7

agreements in time, they should be construed as superseding a CBA in certain circumstances because an LCA reflects the parties' own construction of the CBA.

As observed *supra*, our sister circuits have long enforced this principle and have vacated arbitral awards that disregard last chance agreements. The decisions establishing this principle merit some closer scrutiny. In Tootsie Roll Industries, the Seventh Circuit considered the case of an employee who had been initially discharged for excessive absenteeism; thereafter, however, the employer and the union executed a last chance agreement, and the employee was subjected to reduced discipline. See Tootsie Roll Industries, 832 F.2d at 82. In exchange for being reinstated with back pay, the employee agreed that she would not miss any further days "for any reason whatsoever." See id. After missing another day, the employee was discharged, and she and the union went to arbitration. At arbitration, the arbitrator considered only the employer's liberal shop policy, which did not count excused absences, and reinstated the employee. See id. at 83. The district court vacated the award, and the Seventh Circuit affirmed on the ground that the arbitrator had no authority to modify the LCA, but rather was bound to enforce it as written. By not basing his award in "the essence of the agreement," the arbitrator neglected his duty to follow the "clear requirements" of the parties' negotiated contracts. Id. Under these circumstances, the arbitration award effectively eliminated the purpose of the LCA, which was to subject the employee to a higher standard than her peers. The court observed that, had the parties intended the regular policy to apply, there would have been no reason to spell out more specific attendance requirements in the LCA. See id.

Similarly, in Coca-Cola Bottling, the union and the employer agreed to a last chance agreement to save an employee union member from discharge due to poor performance. See Coca-Cola Bottling, 959 F.2d at 1439. The LCA provided that the employee would be suspended and that

8

any future similar offenses would result in discharge. Upon his reinstatement, the employee committed such an offense and was discharged. At arbitration, the arbitrator found that the employee had committed the offense at issue, but determined that the collective bargaining agreement did not permit the employer to discharge the employee. See id. at 1440-41. The district court vacated the award, and the Eighth Circuit affirmed, finding that the LCA "superseded the collective bargaining agreement." Id. at 1440. As such, the arbitrator was required to view the express provisions of the LCA as representing the parties' actual intentions with respect to this employee.

Finally, in Ohio Edison, the Sixth Circuit reaffirmed its holding in Bakers Union by ruling that an arbitrator does not have the authority to disregard the explicit terms of a prior settlement or last chance agreement. See Ohio Edison, 947 F.2d at 787. In Ohio Edison, an employee with a drug abuse problem was given a last chance to desist from using drugs or face termination. After continuing to use drugs, the employee was terminated. At arbitration, the employee was reinstated because the arbitrator found the LCA to be "unreasonably harsh." Id. The district court enforced the arbitration award, but the Sixth Circuit reversed and remanded, holding that "normally last chance agreements are binding in arbitration," and observing that here the arbitrator did not have the authority to set aside the LCA, even if it were harsh. Id.

In the case at bar, the arbitrator similarly disregarded his obligation to enforce the LCA. After Gates's dismissal, the union interceded and negotiated a last chance agreement which placed Gates back on the job; there is no evidence countering Cooper Natural's claim that all parties had formally agreed, in the LCA, to a final resolution of their dispute. Indeed, each of the union's arguments before this court addresses the propriety of Gates's discipline, not the binding nature of the LCA.

9

By ignoring the LCA and substituting his own impressions in the arbitration, the arbitrator fundamentally ignored his responsibility to construe the parties' agreements in an evenhanded way.

## III. CONCLUSION

For these reasons, we establish today that a last chance agreement will in most cases supersede the terms of a collective bargaining agreement, and should be viewed as such by an arbitrator. As the arbitrator in this case failed to do so, we hold that the district court properly vacated the arbitration award, and we thus AFFIRM the order of the district court in all respects.