**BNSF RAILWAY COMPANY,
Plaintiff,**

v.

**BROTHERHOOD OF LOCOMOTIVE
ENGINEERS & TRAINMEN,
Defendant.**

**No. 4:06–CV–705–A.**

United States District Court,
N.D. Texas,
Fort Worth Division.

Nov. 27, 2007.

Charles W. Shewmake, David M. Pryor, Burlington Northern & Santa Fe Railway Co., Fort Worth, TX, for Plaintiff.

Michael S. Wolly, Zwerdling Paul Leibig Kahn & Wolly, Washington, DC, Rod Tanner, Tanner and Troutt, Fort Worth, TX, for Defendant.

## MEMORANDUM OPINION and ORDER

JOHN McBRYDE, District Judge.

For the reasons stated in this memorandum opinion and order, the court has concluded that the motion for summary judgment filed by plaintiff, BNSF Railway Company, ("BNSF") should be granted to the extent provided below, that the counter-motion for summary judgment filed by defendant, Brotherhood of Locomotive Engineers & Trainmen, ("Brotherhood") should be denied, that Award No. 26337 (pertaining to the claim asserted by Brotherhood on behalf of K.R. Hughes) of the National Railroad Adjustment Board, First Division ("Board") should be vacated,

and the controversy should be remanded to the Board for further consideration.

### I.

### Proceedings Before, and Rulings of, the Board

Award No. 26337 resulted from a claim made by Brotherhood on behalf of K.R. Hughes ("Hughes"), an engineer employed by BNSF, pursuant to the collective bargaining agreement between BNSF and Brotherhood ("Agreement"). Brotherhood sought by its claim the restoration of Hughes's employment service, with pay for all time lost, seniority, vacation, and all other benefits unimpaired, in connection with discipline, in the form of dismissal, imposed by BNSF on Hughes on October 31, 2003, following a formal investigation conducted October 8, 2003, as part of the grievance process.

The facts leading to the dismissal are, briefly, as follows: On August 26, 2003, a train being operated by Hughes as the engineer derailed in the process of switching in the San Diego Yard. The cause of the derailment was a broken switch blade, but the extent of the damage and the distance traveled by the cars after derailment evidenced a speed limit infraction. Consequently, the entire train crew was required to submit to a drug/alcohol test pursuant to 49 C.F.R. § 219.301. As part of the test, Hughes was required to provide on August 26, 2003, a urine sample and to sign a testing form stating that the sample was hers and that she did not adulterate it. The laboratory reported after testing the urine that it was not consistent with human urine. When informed of the test result, Hughes requested further testing, which was done on urine from the sample given on August 26, both by the original testing laboratory and by a different laboratory. The result of each of

those tests was the same as the original test—not consistent with human urine. After a formal investigation was conducted by BNSF Superintendent of Operations Kevin C. McReynolds ("McReynolds") of the charge that Hughes had submitted a substituted or adulterated urine sample on August 26, which is functionally the equivalent to refusing to submit to a test under BNSF's rules, Hughes was found guilty of the charge and her employment with BNSF was terminated.

The Board chose not to make a ruling on the merit of the charge against Hughes, but, instead, ruled in her favor on the procedural ground that BNSF violated a rule in the collective bargaining agreement that the investigation be fair and impartial. In the Board's view, such a violation resulted from the same individual, McReynolds, filing the charges against Hughes, conducting the hearing, developing evidence supporting those charges, passing judgment on whether the hearing he conducted was fair and proper, determining whether the evidence in the record of the hearing was adequate to prove the charges, and, finally, imposing the penalty. The Board described the basis of its award for Hughes as follows [1]:

> [T]he multiple-role objection is firmly grounded in the factual record and proves fatal to Carrier's decision to discharge this Claimant. It simply is incompatible with Rule 50's [2] guarantee of a fair and impartial Investigation to allow the same individual who filed the charges against the Claimant to conduct

the hearing and develop evidence supporting his own charges, to pass judgement [sic] whether the hearing he conducted was fair and proper (including his refusal to call requested witnesses), to determine whether the evidence in the record of the hearing he conducted was adequate to prove the charges which he had filed and finally to impose the penalty. Based on the egregious violation of the due process mandate of Rule 50 in this case the dismissal action must be voided without reference to the merits.

> Based upon all of the foregoing, this Board concludes that the Claimant must be reinstated to her former position without loss of seniority or other rights and benefits, made whole in all respects and her record adjusted to remove all reference to the voided dismissal.

J.A. at 4 (footnote added).

The carrier members [3] of the Board filed a dissent, noting that the procedure to which the majority objected has been upheld time and time again. They expressed their distress at the conduct of the Board in returning to service an engineer who "unquestionably and deliberately evaded a federal law, as well as the Carrier's Rules, by surreptitiously substituting her specimen with something that is 'not consistent with human urine.'" *Id.* at 5–5a. In conclusion, the dissenters submitted "that the Award is contrary to public policy, has no basis in reason or fact, and is unenforceable." *Id.* at 5a.

---

1. In the award the Board refers to BNSF as the "Carrier," Brotherhood as the "Organization," and Hughes as the "Claimant."

2. Rule 50, which is a part of the collective bargaining agreement, provides, in pertinent part, that "[e]ngineers will not be dismissed or held out of service, or otherwise disciplined [with an exception not applicable in

this case] without a fair and impartial investigation, if desired." J.A. at 304.

3. The Board consisted of members selected by the labor organizations, an equal number of members selected by the carriers, and a referee. *See* 45 *U.S.C.* § 153, First (h), First division, and (1).

## II.

### *The Contentions of the Parties*

#### A. *BNSF's Contentions.*

This action was initiated by a complaint filed by BNSF on October 10, 2006, asking that the court vacate Award No. 26337 for the reasons that:

(1) Because, according to BNSF, the Board implicitly found that BNSF had just cause to terminate Hughes, the Board acted outside its jurisdiction when it reinstated Hughes based on an alleged procedural default.

(2) The Board's award violates a well-defined public policy against reinstating a former employee who willfully evaded a federal law and BNSF's rules by submitting an adulterated urine sample to a safety-sensitive position.

BNSF prays in its complaint that the court vacate the Board's award and reinstate BNSF's dismissal of Hughes.

BNSF filed its motion for summary judgment on January 31, 2007, asking the court summarily to vacate the Board's award and reinstate BNSF's dismissal of Hughes on the grounds that:

(1) The Board's decision to reinstate Hughes without further monitoring or punishment violates well-established public policy as evidenced by several Federal Railroad Administration ("FRA") regulations.

(2) The Board acted outside the scope of its contractual jurisdiction. BNSF's sub-grounds under this main ground are that: (a) by allowing Hughes to return to work with no discipline record was contrary to the terms of the Agreement, (b) the failure of the Board to impose the 90–day disqualification and a Substance Abuse Professional ("SAP") treatment plan caused the award to be contrary to the language of the Agree-ment providing for suspension and indefinite lay-off for treatment/evaluation in cases such as Hughes's, and (c) the Board's findings of fact establish, according to BNSF, that the Agreement's standard for discharge was met.

#### B. *Brotherhood's Contentions.*

Brotherhood filed an answer and counter-petition on September 7, 2006. By the counter-petition, Brotherhood prayed for an order of the court enforcing Award No. 26337 on the ground that the Board properly ruled that Hughes should be reinstated with full benefits because of the conduct of BNSF in causing McReynolds to serve in multiple roles in the investigation into Hughes's conduct and the discipline taken against Hughes.

On January 31, 2007, Brotherhood filed its motion for summary judgment urging summary adjudication enforcing the award of the Board. In response to the contentions made by BNSF for vacatur of the Board's award, Brotherhood argued in support of its motion that:

(1) Public policy is not an accepted ground for review under the Railway Labor Act ("RLA"), 45 U.S.C. §§ 151–188.

(2) Even if public policy were a permissible ground for setting aside an award under the RLA, there is no public policy barring Hughes's reinstatement.

(3) Because BNSF did not obtain a valid determination that Hughes violated any policy against drug use, the award reinstating her did not violate public policy.

\* \* \* \* \* \*

The parties concur that the court should dispose of this case by a ruling on the motions for summary judgment and that there is no fact issue to be resolved by a fact finder.

### III.

### Analysis

The RLA applies to this case. The claims reached the Board for rulings pursuant to the authority of 45 U.S.C. § 153 First (i). Enforcement of the awards is governed by § 153 First (p), which authorizes the bringing of an action in a district court to enforce an order of the Board, and authorizes the court to make such order and enter such judgment as may be appropriate to enforce or set aside the order of the Board, with the proviso that "such order may not be set aside except for failure of the [Board] to comply with the requirements of [the RLA], for failure of the order to conform, or confine itself, to matters within the scope of the [Board's] jurisdiction, or for fraud or corruption by a member of the [Board]." 45 U.S.C. § 153 First (p). BNSF's action to set aside the awards is governed by 45 U.S.C. § 153 First (q). The judicial authority, and limitations of authority, in an action brought under § 153 First (q) parallel the authority and limitations prescribed by § 153 First (p).

 As the language of the statute suggests, board awards are reviewable by a district court on narrow grounds. *Continental v. Int'l Bhd. of Teamsters,* 391 F.3d 613, 617 (5th Cir.2004). "Normally, an award is deemed to be within the Board's jurisdiction when it is grounded in the [collective bargaining agreement]." *Id.* "Unless a court concludes that the Board's interpretation of the contract is wholly baseless and completely without reason, the Board's interpretation must stand." *Id.* (quotation marks omitted). However, an award of the Board "settling a dispute with respect to the interpretation or application of a labor agreement must draw its essence from the contract and cannot simply reflect the arbitrator's own notion of industrial justice." *Id.* (quoting *United*

*Paperworkers Int'l Union v. Misco, Inc.,* 484 U.S. 29, 38, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987)).

 This court has been directed by the Fifth Circuit not to uphold a Board's decision "when it dispenses its own brand of industrial justice outside the scope of an arbitration agreement." *American Eagle Airlines v. Air Line Pilots Ass'n,* 343 F.3d 401, 405 (5th Cir.2003) (quotation marks omitted). The Fifth Circuit has ruled that the court is "free to scrutinize an arbitrator's award to ensure that the arbitrator acted in conformity with the jurisdictional prerequisites of the collective bargaining agreement." *Id.* (quotation marks omitted). "Where an arbitrator exceeds his contractual authority, vacation or modification of the award is an appropriate remedy." *Delta Queen Steamboat Co. v. Dist. 2 Marine Engineers,* 889 F.2d 599, 602 (5th Cir.1989).

BNSF's jurisdictional argument is not directed to the Board's finding that the hearing before McReynolds was not fair and impartial. In its reply to Brotherhood's response to its motion for summary judgment, BNSF explained:

> Simply stated, BNSF is not asking the Court to reexamine the Board's finding that the hearing was not fair and impartial. Rather, BNSF is asking the Court to find that the Board exceeded its contractual authority and violated by public policy by reinstating Hughes without penalty after finding that the record showed that her urine sample was adulterated.

BNSF's Reply at 3. Put another way, BNSF has limited its contentions to (1) the contention that the Board found that the record showed that Hughes's urine sample was adulterated and (2) the contentions that, having made such a finding, the Board had no authority under the Agree-

ment to reinstate Hughes without penalty, and an award of the Board having that effect would be against public policy.

The court cannot agree with the first of BNSF's contentions. Brotherhood is correct in saying that the recitations in the award of the Board pertaining to the analyses of Hughes's urine sample are not findings of fact that the analyses were correct. The Board found that "[t]he record shows that there were no violations of testing protocol in the collection of [Hughes's urine sample] or the chain of custody," J.A. at 2, and that:

> On September 15, 2003, Carrier's Medical Review Officer (MRO) contacted the Claimant to discuss that testing laboratory urinalysis indicated the specimen she had provided showed readings "not consistent with human urine" i.e., a specific gravity of 1.005 and insufficient Creatinine level detected. At the Claimant's request the split sample was retested by both the original testing laboratory and a different laboratory, with the same results.

Id.

A more accurate interpretation of the language used by the Board is that the Board found that the reports of the laboratory testing showed that the urine specimen Hughes provided on August 26, 2003, was not consistent with human urine; but, such a finding is not the same as a finding that the laboratory reports were accurate. However, this appears to be a nonissue, because a valid conclusion that the record of the hearing established without genuine dispute that the urine was adulterated or substituted would be the equivalent for the purposes of this analysis of a finding by the Board of that fact. The court concludes that the fact of adulteration or substitution of the urine sample is established without genuine dispute in the record of the hearing,[4] and that no rational Board could have failed to find from the record that Hughes's urine was adulterated.[5] That being so, the Board would have exceeded its jurisdiction if it had found otherwise. See Brotherhood of R.R. Trainmen v. Cent. Ga. Ry. Co., 415 F.2d 403, 411–12 (5th Cir.1969) (saying that "[i]n the arbitration context, an award without foundation in reason or fact is equated with an award that exceeds the authority or jurisdiction of the arbitrating body." (quotation marks omitted)).

The question now presented is whether the Board exceeded its authority by declining to make a finding on the merits of the claim and ordering an award favorable to Hughes in the face of a record that establishes without genuine dispute that Hughes provided a urine sample that was adulterated or substituted. BNSF's governing guideline, which, in effect, was incorporated into the Agreement, contained the following provision:

> 7.4 Employees refusing to participate in any federal or BNSF drug and/or alcohol test will be removed from service immediately and disqualified from service for a period of a least nine (9) months (FRA mandatory), and subject to dismissal from service with BNSF. A verified adulterated or substituted

---

4. The testimony of witness Crespin taken at the hearing before McReynolds, and exhibits received at the hearing, leave no room for rational disagreement with the proposition that the urine specimen submitted by Hughes was not consistent with human urine. J.A. at 56, 59–61, 66, 68, 72–78, 129, 131–32, 136–38.

5. The applicable regulations require a testing laboratory to consider the primary specimen to be adulterated if it determines that the physical characteristics of the specimen are outside the normal expected range for human urine. Procedures for Transportation Workplace Drug and Alcohol Testing Programs, 49 C.F.R. § 40.95(a)(3) (2006).

specimen is considered a refusal to test.

J.A. at 237.[6]

■ If the public policy concern is put aside, the issue narrows to whether the Board exceeded its jurisdiction when it chose not to address the merits of the claim but, instead, to make an award in favor of Hughes without regard to the merits, and somewhat as a punishment to BNSF, because of BNSF's failure to provide Hughes a fair and impartial hearing.[7] The court has concluded that, public policy put aside, the Board's award was within its jurisdiction. The collective bargaining agreement, in its Rule 50, explicitly prohibits dismissal of an engineer "without a fair and impartial investigation." *Id.* at 304. The parties seem to be in agreement that the Board correctly interpreted the word "investigation" to include the hearing conducted by McReynolds. Unless public policy dictates otherwise, the Board certainly had within its authority to reinstate an engineer who was dismissed in violation of this very clear directive to BNSF that it must not dismiss an engineer unless the dismissal follows a fair and impartial investigation. The court now turns its attention to the public policy issue.

■ So far as the court can tell, there is no Fifth Circuit holding on the issue of whether a Board award made under the authority of the RLA can be vacated on the ground that it violates public policy.[8] However, the court is satisfied that such a vacatur would be consistent with Supreme Court and Fifth Circuit precedent. In *United Paperworkers International Union v. Misco, Inc.*, 484 U.S. 29, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987), the Supreme Court recognized that violation of a public policy can justify a court's refusal to enforce an arbitrator's award under a collective bargaining agreement. *Id.* at 42–43, 108 S.Ct. 364. However, such a refusal must be based on "some explicit public policy that is well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." *Id.* at 43, 108 S.Ct. 364 (quotation marks omitted). "[T]he question of public policy is ultimately one for resolution by the courts." *W.R. Grace & Co. v. Local Union 759*, 461 U.S. 757, 766, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983). *See also Gulf Coast Indus. Workers Union v. Exxon Co.*, 991 F.2d 244, 248 n. 5 (5th Cir.1993).

The Fifth Circuit, in reliance on *Misco*, set aside an arbitration award under a collective bargaining agreement as being

---

6. The regulations of the office of the Secretary of Transportation provide that if adulteration or substitution is reconfirmed on retesting (testing of a split specimen), "refusal to test" is the final result. 49 C.F.R. § 40.187(a)(2).

7. Because BNSF has, in effect, conceded the propriety of the Board's finding that the hearing was not fair and impartial, the court has not conducted an evaluation as to whether it was.

8. While public policy was urged in *Continental Airlines, Inc. v. International Brotherhood of Teamsters*, 391 F.3d 613, 620 (5th Cir. 2004), as a reason for vacating the award of a Board in favor of an airline employee who had tested positive for alcohol, the Fifth Cir-

cuit was not required to reach the public policy issue. *Id.* at 620. Other circuits have held that arbitration awards under the Railway Labor Act are subject to public policy review. *See, e.g., Union Pac. R.R. Co. v. United Transp. Union*, 3 F.3d 255, 258 (8th Cir. 1993) (vacating a Board's award reinstating a railroad employee without determining the likelihood of his working on the railroad in the future under the influence of alcohol or drugs on the grounds that the Board's ruling violated public policy). The court is not persuaded by the district court decisions to the contrary that Brotherhood cites in its summary judgment papers. Brotherhood's Br. in Supp. of its Mot. at 14–16.

against the "well-defined and dominant public policy underlying our nation's efforts to promote a workplace free of drugs and alcohol." *Gulf Coast Indus. Workers Union,* 991 F.2d at 257 (quotation marks omitted). *See also Oil, Chem. & Atomic Workers, Int'l Union, Local No. 4–228 v. Union Oil Co. of Cal.,* 818 F.2d 437, 442 (5th Cir.1987) (stating that "[t]his court has recognized the strong public policy against the operation of dangerous equipment by persons using drugs or alcohol"); *Amalgamated Meat Cutters & Butcher Workmen of N. Am. AFL–CIO, Local Union 540 v. Great W. Food Co.,* 712 F.2d 122, 124 (5th Cir.1983) (noting that "[i]n a nation where motorists practically live on the highways, no citation of authority is required to establish that an arbitration award ordering a company to reinstate an over-the-road truck driver caught drinking liquor on duty violates public policy"); *NLRB v. Dixie Motor Coach Corp.,* 128 F.2d 201, 203 (5th Cir.1942) (explaining that "[t]he public interest, as well as that of the employer, requires of anyone entrusted with the lives and safety of the traveling public that he conduct himself in a manner in keeping with his responsibilities.").

The public policy applicable to this case is well-defined and dominant. Part 219 of the regulations is directed to the "Control of Alcohol and Drug Use." 49 C.F.R. § 219 (2006). The purpose and scope of 49 C.F.R. § 219 is defined in § 219.1 as follows:

(a) The purpose of this part is to prevent accidents and casualties in railroad operations that result from impairment of employees by alcohol or drugs.

(b) This part prescribes minimum Federal safety standards for control of alcohol and drug use. This part does not restrict a railroad from adopting and enforcing additional or more stringent requirements not inconsistent with this part.

Because of the derailment of a train on which Hughes was the engineer, she became subject to the testing requirements of 49 U.S.C. § 219.301(b)(2). The testing is calculated to inform the employer whether the engineer has drugs in her system while on duty. If the employee was possessing or using drugs while on duty, the employee would be in violation of the regulations. 49 C.F.R. §§ 219.101 & 219.102. The testing to which Hughes was subjected on August 26, 2003, was contemplated by the regulations, which provide a complex testing scheme to identify and remove employees that pose a threat due to drug use. *See* 49 C.F.R. § 219.201 (post-accident testing where the accident involves a fatality, the release of hazardous material, damage to railroad property above specified dollar amounts, or an injury aboard a passenger train); § 219.301 (reasonable cause testing under numerous circumstances); § 219.501 (pre-employment drug screens); § 219.601 (random drug testing).

In determining whether public policy has been violated by the Board's award, the court does not look to Hughes's adulteration or substitution of her urine sample but, rather, to the effect the award of the Board has on the public interest. In a somewhat analogous circumstance, the Supreme Court explained in *Eastern Associated Coal Corp. v. United Mine Workers,* 531 U.S. 57, 121 S.Ct. 462, 148 L.Ed.2d 354 (2000), that "of course, the question to be answered is not whether Smith's drug use itself violates public policy, but whether the agreement to reinstate him does so." *Id.* at 62–63, 121 S.Ct. 462.

The court has concluded that public policy dictates that the award of the Board reinstating Hughes to her position of employment with BNSF as a train engineer

without penalty, a rehabilitative requirement, or a monitoring requirement, be vacated. Public policy will not permit the Board to disregard the fact that Hughes's adulteration or substitution of her urine sample was established by the record and that under the controlling BNSF rule and the applicable regulations Hughes's conduct in submitting a verified adulterated or substituted specimen is considered a refusal to submit to a drug test. J.A. at 237; 49 C.F.R. § 40.187(a)(2) (2006). Reinstatement of Hughes to a position of employment with BNSF would appear to be within the Board's jurisdiction, but when it did so in a manner that did not appropriately take into account Hughes's drug use, which is inferred by her adulteration or substitution of the urine sample, the Board went further than public policy permits.

The regulations require that after a positive drug test the railroad must "immediately remove the employee from covered service." 49 C.F.R. § 219.104(a). The employee may not be returned to service following a positive drug test until she has been evaluated for drug dependence, has successfully completed a program of counseling or treatment, and has tested negative for the presence of controlled substances. 49 C.F.R. § 219.104(a). An employee who refuses (as Hughes is deemed to have done) to provide a body-fluid specimen when required by the railroad under a mandatory provision of the regulations must be deemed disqualified for a period of nine months. 49 C.F.R. § 219.107(a). The requirement of disqualification for nine months does not limit discretion on the part of the railroad to impose additional sanctions for the same conduct. 49 C.F.R. § 219.107(d). Upon expiration of

the nine-month period of disqualification, the railroad may permit the employee to return to covered service only under specified conditions, and the employee must be subject to follow-up tests. 49 C.F.R. § 219.107(e) (2006).

The award of the Board in the instant action fails to implement FRA-required discipline, and ignores the treatment regime to be administered by a Substance Abuse Professional under the regulations. 49 C.F.R. §§ 219.104(d), 40.299, 40.305, 40.307 (2006).[9] Rather, the award affirmatively violates the regulatory scheme as well as BNSF's guidelines for drug violations. The award directs BNSF that Hughes is to be "reinstated to her former position without loss of seniority or other rights and benefits, made whole in all respects and her record adjusted to remove all reference to the voided dismissal." J.A. at 4. By doing so, the award frustrates the regulatory requirements that Hughes be disqualified for a period of nine months, successfully complete a program of counseling or treatment, and test negative for the presence of controlled substances. The award strongly suggests that the Board is directing that Hughes may not be forced to compromise her privacy (or other rights) and undergo testing or other conditions related to her dismissal as a condition of reinstatement. Similar requirements of BNSF's guidelines for drug violations are violated by the Board's award. J.A. at 237 §§ 7.4, 7.7 and 238 §§ 8.1–8.10.

In deference to the Board, the court has concluded that this controversy should be remanded to the Board so that it might take action consistent with this opinion. The court is not dictating to the Board the exact nature of the action it should take to

9. The Substance Abuse Professionals program and the return-to-duty process are the subjects of Subpart O of Part 40 of the regulations of the office of the Secretary of Transportation. 49 C.F.R. §§ 40.281–40.313 (2006).

cause its award on remand to be consistent with public policy, but suggests that if it awards reinstatement of Hughes to her position of employment with BNSF it include in its award an appropriate disqualification period and a requirement that she should participate in an appropriate substance abuse treatment and monitoring plan. Presumably, the Board in making its award will take into account Section 7 of BNSF's policy on the use of alcohol and drugs. Subsection 7.4 provides that an employee who refuses to participate in a drug test will be removed from service immediately and disqualified from service for a period of at least nine months, and that a verified adulterated or substituted specimen is considered a refusal to test; subsection 7.5 says that all alcohol and drug violations are considered serious, and that drug and alcohol violations will be considered with prior serious violations for assessing appropriate discipline; and subsection 7.7 tracks the FRA regulations in specifying additional restrictions and procedures regarding drug use for locomotive engineers. In whatever award the Board makes upon remand, the Board should have an eye to inclusion in the award of elements that would serve the public interest of tending to eliminate the possibility that Hughes would in the future consume, or be under the influence of, a prohibited substance while engaged in the performance of her duties as a train engineer.

## IV.

### ORDER

For the reasons given above,

The court ORDERS that BNSF's motion for summary judgment be, and is hereby, granted to the extent provided herein.

The court further ORDERS that Brotherhood's motion for summary judgment be, and is hereby, denied.

The court further ORDERS that Award No. 26337 pertaining to the claim made by Brotherhood on behalf of Hughes be, and is hereby, vacated.

The court further ORDERS that the controversy is remanded to the Board for further consideration and an award consistent with this memorandum opinion and order.