IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 13, 2009

Charles R. Fulbruge III
Clerk

No. 07-20835

CONTINENTAL AIRLINES, INC.

Plaintiff-Appellee

v.

AIR LINE PILOTS ASSOCIATION, INTERNATIONAL

Defendant-Appellant

Appeal from the United States District Court
for the Southern District of Texas

Before KING, HIGGINBOTHAM, and WIENER, Circuit Judges.

JACQUES L. WIENER, Jr., Circuit Judge:

Captain Ronald McWhirter, represented by the Air Line Pilots Association ("ALPA"), appeals an order by the district court reversing the reinstatement order of the System Board of Adjustment ("SBA"), a creature of the Collective Bargaining Agreement ("CBA") between his employer, Continental Airlines, Inc. ("Continental") and ALPA. He claims that the district court failed to give the proper deference owed to the decision of the SBA and that the SBA decision does not contravene public policy. Concluding that the district court was without a statutory basis for its reversal and that its order cannot be sustained on grounds of public policy, we reverse the district court's reversal of the SBA and remand

with instructions to vacate a portion of the SBA order and remand the matter to the SBA.

## I. FACTS AND PROCEEDINGS

McWhirter was hired by Continental as a pilot in 1984. He was discharged on February 23, 2005 for refusing to take a no-notice alcohol test. At the time of his discharge he was on long-term disability status and was not qualified to fly.

McWhirter's trouble with alcoholism first came to Continental's attention in 1999 when he sought voluntary assistance from Continental's Peer Pilot Program. After fits and starts toward sobriety, he tested positive during a no-notice alcohol test on September 21, 2000, a day on which he was scheduled to fly. Pursuant to the CBA between Continental and ALPA,[1] he entered into a Last Chance Agreement ("LCA") on October 18, 2000. In addition to other requirements, such as submitting to evaluation and rehabilitation treatment by Continental's Employee Assistance Program ("EAP"), the LCA required McWhirter to agree to submit to no-notice testing as often as Continental directed for five years after he completed formal rehabilitation. He was reinstated to flight status in June or July of 2001, but was placed on long-term disability status in late March or early April of 2004 for hypertension.

On February 10, 2005, while still subject to the LCA's no-notice testing provisions, McWhirter refused a no-notice alcohol test. After Continental discharged him, ALPA filed a grievance on his behalf and the case wound its way though the CBA's review process. Ultimately, his grievance — that he was discharged without just cause — was heard by the SBA.

At a two day hearing in January 2006, at which both parties presented evidence to the SBA, McWhirter claimed that he refused the February 10, 2005

---

[1] The CBA in force at the time of McWhirter's discharge, "Contract '97," has been superseded by agreement of the parties.

test because, inter alia, he was upset that Continental had not told him the results of a no-notice test from January 2005. That test had been ordered after Continental received an allegation that McWhirter had been drinking with a fellow pilot. At the meeting after which the January no-notice test was ordered, McWhirter was threatened with termination if the test came back positive. He testified that he had become extremely frustrated not to have been promptly informed of the results. The test results were supposed to be available in a week; at the time of McWhirter's refusal to be retested, almost a month had passed. As it turns out, Continental had received a negative result on the alcohol test a week before his refusal to be retested but had not so informed him.

After considering the other explanations offered by McWhirter, for example, that he did not believe that he was subject to no-notice testing based on his leave status, the SBA concluded that McWhirter knowingly refused to take the no-notice test. The SBA also concluded that under the mitigation provisions of the CBA (in particular, Section 15,[2] Part 5, Sub-part 8(B)), McWhirter's refusal was an understandable, if not entirely rational, response to Continental "dropping the ball" on the January 2005 test results. The SBA ordered McWhirter's reinstatement, conditioned on his participation in Continental's EAP and Peer Pilot Program for two years. Continental was ordered to reinstate him to the status he held prior to discharge, viz., non-flying under either long-term disability leave or the Family Medical Leave Act.

---

[2] The currently applicable Section 15 was split between two sections, Section 15 and Section 25, in "Contract '97." On October 30, 2003, Continental and ALPA agreed to "delet[e] those sections in their entirety and substitut[e] therefor the entire section titled 'PHYSICAL EXAMINATIONS' attached to this Letter of Agreement." The mitigation provision on which McWhirter relies (Section 15, Part 5, Sub-part 8(B)) did not appear in Section 25 of Contract '97 (the section referenced by the LCA), but no party seems to contest that Sub-part 8(B) of the current agreement is something on which McWhirter can at least claim to rely (even if Continental believes that the CBA itself or that sub-part is, as an interpretative matter, incorrect to select as governing McWhirter's refusal to be tested). For purposes of clarity and ease of understanding, we will, mutatis mutandis, refer to the current Section 15 wherever the old Sections 15 and 25 were mentioned.

Continental commenced suit in district court to vacate the SBA's order. After the parties cross-moved for summary judgment, the district court granted Continental's motion and reversed the SBA's reinstatement order. This timely appeal by ALPA on McWhirter's behalf followed.

## II. ANALYSIS

McWhirter contends that the district court failed to defer to the SBA decision as required by the Railway Labor Act (the "RLA")[3] and that no judicially enforceable public policy precludes his reinstatement. We address each contention in turn.

### A. The RLA

#### 1. Standard of Review

We review a district court's grant of summary judgment de novo.[4] Summary judgment is appropriate when the

> record indicates no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. In considering summary judgment, we must view the evidence in the light most favorable to the nonmoving party. Yet, the nonmoving party must set forth specific facts showing the existence of a genuine issue concerning every essential component of its case.[5]

#### 2. Applicable Law

This is a dispute over a grievance that involves the interpretation and application of the Continental-ALPA CBA and of the LCA entered into by McWhirter and Continental. As such, it is classified as a "minor dispute" under the RLA.[6] Minor disputes must be resolved through compulsory and binding

---

[3] 45 U.S.C. §§ 151 et seq. (2006).

[4] Resolution Performance Prods., LLC v. Paper Allied Indus. Chem. & Energy Workers Int'l Union, Local 4-1201, 480 F.3d 760, 764 (5th Cir. 2007).

[5] Am. Eagle Airlines, Inc. v. Airline Pilots Ass'n, Int'l, 343 F.3d 401, 405 (5th Cir. 2003) (internal citations and quotation marks omitted).

[6] Mitchell v. Cont'l Airlines, Inc., 481 F.3d 225, 230-31 (5th Cir. 2007).

arbitration before the SBA.[7] "Judicial review of [SBA] decisions arising from the terms of a [CBA] is narrowly limited, and courts should afford great deference to arbitration awards."[8] The standard for this review is "among the narrowest known to the law"[9] and flows from the RLA's "preference for the settlement of disputes in accordance with contractually agreed-upon arbitration procedures."[10] We will defer to an SBA decision based on any reasonable ground presented by the parties, even if not relied on by the SBA in its decision.[11]

We may decline to defer to a decision of the SBA only if (1) the SBA failed to comply with the RLA, (2) there is evidence of fraud or corruption in the SBA, or (3) the order by the SBA did not "confine itself to matters within the scope of [the SBA's] jurisdiction."[12] Absent one of those exclusive grounds, or a judicially created exception for public policy concerns, we must defer to the SBA's decision.[13] Continental does not contend that the SBA failed to comply with the RLA or that there is evidence of fraud or corruption in the SBA. Accordingly,

---

[7] Id. at 231.

[8] Resolution Performance, 480 F.3d at 764 (internal quotation marks omitted) (discussing a non-RLA CBA).

[9] E. Air Lines, Inc. v. Transp. Workers Union, Local 533, 580 F.2d 169, 172 (5th Cir. 1978) (internal quotation marks omitted).

[10] Andrews v. Louisville & Nashville R.R. Co., 406 U.S. 320, 323 (1972).

[11] Resolution Performance, 480 F.3d at 767 n.20.

[12] Mitchell, 481 F.3d at 231; see 45 U.S.C. § 153(q) (2006).

[13] We have also said that we must defer unless we find the SBA's decision to be "wholly baseless and completely without reason." Cont'l Airlines, Inc. v. Int'l Bhd. of Teamsters, 391 F.3d 613, 617 (5th Cir. 2004). It is unclear from our cases that quote this language from Gunther v. San Diego & Arizona Eastern Railway Co., 382 U.S. 257, 261 (1965), whether that phrase announces an independent basis for declining to defer to an SBA decision. As Continental does not argue that the district court's order may be sustained on this basis, we need not address it.

only Continental's contention that the SBA failed to conform or confine itself to its jurisdiction is at issue.

The jurisdiction of the SBA and the limits of that jurisdiction arise out the CBA.[14] The SBA therefore fails to conform or confine itself to its jurisdiction if it issues a decision that is contrary to an unambiguous provision of the CBA[15] or an LCA.[16] An LCA is a supplement to the CBA, and its terms are just as binding on an arbitrator as those of the CBA: Unambiguous provisions of an LCA may not be ignored.[17]

This is a narrow exception, however, and "'a court should not reject an award on the ground that the [SBA] misread the contract[s].'"[18] The SBA's decision need only "'draw its essence from the contracts[s] and [not] simply reflect the [SBA's] own notions of industrial justice,'"[19] so that the decision is "grounded in the [contracts]."[20] That is, "'as long as the arbitrator is even arguably construing or applying the contract[s] and acting within the scope of his authority, that a court is convinced he committed serious error does not

---

[14] E. Air Lines, 580 F.2d at 170 n.1.

[15] Resolution Performance, 480 F.3d at 765. Other cases hold that the decision must be contrary to "clear and unequivocal" or "plain" language to warrant reversal. See Am. Eagle Airlines, Inc. v. Airline Pilots Ass'n, Int'l, 343 F.3d 401, 406 (5th Cir. 2003). We do not perceive a difference in these standards.

[16] Cont'l Airlines, 391 F.3d at 618.

[17] Int'l Union of Operating Eng'rs, Local 351 v. Cooper Natural Res., Inc., 163 F.3d 916, 919 (5th Cir. 1999) (discussing a non-RLA LCA).

[18] Cont'l Airlines, 391 F.3d at 617 (quoting United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 38 (1987)).

[19] Id.

[20] Id. (citing Delta Queen Steamboat Co. v. Dist. 2 Marine Eng'rs Beneficial Ass'n, 889 F.2d 599, 602 (5th Cir. 1989)).

suffice to overturn his decision.'"[21]  The SBA "may look beyond the written contract when interpreting a collective bargaining agreement if the instrument is ambiguous or silent upon a precise question."[22]

If we determine that the SBA has exceeded its authority, we are empowered to vacate or modify the SBA's ruling, or to remand to the SBA for further proceedings.[23] "Even in the very rare instances when [SBA] procedural aberrations rise to the level of affirmative misconduct, as a rule the court must not foreclose further proceedings by settling the merits according to its own judgment of the appropriate result . . . ."[24] To do so "would improperly substitute a judicial determination for the [SBA's] decision that the parties bargained for."[25] "[T]he court should simply vacate the award, thus leaving open the possibility of further proceedings if they are permitted under the terms of the agreement . . . [or] remand when this step seems appropriate."[26]

3. Analysis

It is clear from the foregoing that we must defer to the SBA's decision if it may be supported by any analysis of the LCA and CBA, whether or not relied on by the SBA, that "arguably construes" those agreements.  Even if the chain of reasoning is not correct, and the SBA's decision appears to us to be a serious

---

[21]  Id. (quoting Misco, 484 U.S. at 38).

[22]  Delta Queen, 889 F.2d at 602.

[23]  Am. Eagle Airlines, Inc. v. Airline Pilots Ass'n, Int'l, 343 F.3d 401, 406 (5th Cir. 2003); see 45 U.S.C. § 153(q).

[24]  Misco, 484 U.S. at 40 n.10 (emphasis added).  "[T]his court has cited Misco with approval when setting out the standard of review governing awards under the RLA."  Cont'l Airlines, Inc., 391 F.3d at 617 n.3.  But see 48 AM. JUR. 2D Labor and Labor Relations § 43 (2008) (suggesting that such use must carefully considered).

[25]  Misco, 484 U.S. at 40 n.10.

[26]  Id.

error, we must defer as long as no step in the reasoning process ignores an unambiguous provision of the LCA and CBA.

Continental asserts that the SBA exceeded its jurisdiction in three ways: (1) The SBA should not have considered McWhirter's non-medical explanation for his refusal to take the no-notice test; (2) the SBA was without power to order McWhirter's reinstatement based on his non-medical explanation; and (3) the SBA was without power to order McWhirter's continued participation in Continental's EAP. We address each in turn.

a. Non-medical Mitigation Evidence

If the LCA unambiguously excludes any non-medical explanation of McWhirter's refusal to be tested, then Continental's first contention would be correct; the SBA would have acted out of conformity with the jurisdiction conferred on it by the parties. But the LCA not only fails unambiguously to reject inclusion of the non-medical mitigation provision of the CBA, its structure and brevity essentially compel incorporation of the CBA's mitigation provisions.

The relevant portions of the LCA are:

Pursuant to Section [15] of the collective bargaining agreement between [Continental] and [ALPA], we have agreed that your employment is subject to the following terms and conditions:
1. As a condition of continuing employment, you agree to undergo evaluation by the Employee Assistance Program ("EAP") Director (or designee) and to complete any rehabilitation recommended by EAP . . . .
. . . .
3. Your continuing employment shall be conditional upon your compliance with all of the following conditions:
. . . .
c. You shall agree in writing to be subject to "no notice" alcohol testing at the direction of the Company as frequently as the Company may decide for a period of five (5) years from the completion of the formal rehabilitation program. Following the five (5) year period during which you shall be subject to no notice testing, you shall

8

> be obligated only to submit to such further testing as may be required by applicable federal regulations or the collective bargaining agreement . . . .

The LCA's preamble to all of the conditions on McWhirter's continued employment makes clear by its terms that Continental and McWhirter agreed to those conditions "[p]ursuant to Section [15]" of the CBA. Accordingly, Continental cannot plausibly maintain that, using the terms of Section 15 of the CBA, the SBA's analysis of McWhirter's refusal to be tested was not just "seriously wrong," but a failure even arguably to construe the language of the contracts.

The district court recognized that the CBA's mitigation provisions must have been included in the LCA. It concluded that the LCA "does not say [McWhirter] will be fired for not taking a test. This is likely because circumstances could arise that would prevent him from doing it."[27] Common sense compels this conclusion. It is quite unlikely that at the time that it entered into the LCA, Continental believed that it could fire McWhirter for refusing to take an alcohol test if, say, his doctor concluded that his blood volume was so low that it was medically dangerous for him to give a blood sample. The parties must have contemplated that there would be some acceptable excuses for refusing to take a no-notice test when they entered into the LCA.

That observation makes the point that the LCA must have incorporated some parts of the CBA. Continental offers no reason why the SBA's implicit conclusion — that because Sub-part 8(A) must have been incorporated, Sub-part 8(B) must also have been incorporated — was not at least an arguable construction of the CBA and LCA. We deal with Continental's arguments about the propriety of applying Sub-part 8(B) to McWhirter's case below; here we only

---

[27] Cont'l Airlines, Inc. v. Air Line Pilots Ass'n, Int'l, No. H-07-1349, 2007 WL 3047221, at *1 (S.D. Tex. Oct. 18, 2007).

make the point that if Sub-part 8(A) must have been incorporated into the LCA, it was a perfectly reasonable construction for the SBA to conclude that Sub-part 8(B) must have been similarly incorporated. Incorporation is a question logically prior to application. The "[p]ursuant to Section [15]" language in the preamble to the section containing the no-notice testing requirement makes the provisions of Section 15 an obvious choice to provide content to this issue on which the LCA is silent.

Continental itself seemed to recognize as much when it wrote to McWhirter that he "had failed to offer a 'sufficient explanation'" for refusing the no-notice test. The district court relied on that letter to conclude that Continental thought itself obliged to consider explanations and to excuse McWhirter's refusal for at least some subset of those explanations. The SBA has the ability to look beyond the LCA when faced with an ambiguous term or silence; it could have considered Continental's letter evidence of the parties' intention that some reasons proffered for refusing to test must be acceptable under the LCA.

The brevity of the LCA and its failure to define no-notice testing also belie Continental's argument that the LCA did not incorporate the mitigation provisions of the CBA. The LCA is obviously intended to supplement the CBA, not replace it. For example, what is no-notice testing? The practices of the parties appear to have conformed to the no-notice testing procedures set out in Section 15 of the CBA, something else the SBA could have considered when deciding whether reference to Section 15 of the CBA was appropriate in interpreting the LCA.

Finally, according to the SBA's decision, Continental relied primarily on part of Section 15, albeit a different part than did McWhirter, during the SBA

proceedings.[28] That is evidence that Continental considered Section 15 to be incorporated by reference into the LCA, or, at the least, that such a reading was arguable.

Some of the above arguments may not be the most natural reading; some may be incorrect; some may even be "serious errors" of interpretation. None of that matters under the RLA, however, because the existence of such arguments in favor of reading the LCA and Section 15 of the CBA in pari materia compels the conclusion that the SBA's interpretation — that the LCA incorporates or does not displace the CBA's mitigation provisions — "draws its essence" from the agreements between Continental and McWhirter.[29]

Turning to those provisions, Section 15, Part 5, Sub-part 8(B) of the version of the CBA that the parties agree governs this dispute states:

> A pilot who refuses or fails to cooperate in any drug or alcohol test as mandated . . . by this Agreement, or who misses a no-notice test without a valid reason shall upon request have his circumstances reviewed by the Company. The Company shall consider such mitigating circumstances as the pilot may offer, and give those circumstances fair consideration.

---

[28] "As the parties' positions clearly demonstrate, the Carrier places primary reliance upon Sub-part A of Section 15 while the Association relies upon Sub-part B of Section 15." In Re Arbitration Before the Cont'l Airlines, Inc. & Air Line Pilots Ass'n. Sys. Bd. of Adjustment, No. CAL-ALPA 05-01/McWhirter, p. 31 (SBA, Feb. 11, 2007).

[29] Continental cites International Union of Operating Engineers, Local 351 v. Cooper Natural Resources, Inc., 163 F.3d 916 (5th Cir. 1999), to support the proposition that LCAs must be strictly construed by an SBA. In our discussion of Cooper in Continental Airlines, Inc. v. International Brotherhood of Teamsters, 391 F.3d 613, 618 (5th Cir. 2004), we explained that LCAs and CBAs are entitled to the same amount of deference. Some circuits appear to treat interpretations of an LCA less deferentially. See, e.g., Ohio Edison Co. v. Ohio Edison Joint Council, 947 F.2d 786, 787 (6th Cir. 1991); Tootsie Roll Indus., Inc. v. Local Union No. 1, Bakery, Confectionery & Tobacco Workers' Int'l Union, 832 F.2d 81, 83–85 (7th Cir. 1987). If so, that approach, like the markedly less deferential approach of some circuits to any SBA decision, see Boise Cascade Corp. v. Paper Allied-Indus., Chem. & Energy Workers (PACE), Local 7-0159, 309 F.3d 1075, 1085-86 (8th Cir. 2002); Coca-Cola Bottling Co. of St. Louis v. Teamsters Local Union No. 688, 959 F.2d 1438, 1441-42 (8th Cir. 1992), is not the law of this circuit. We did not, however, find those cases in conflict with our precedents in Continental Airlines. 391 F.3d at 618-19.

This provision, combined with the SBA's jurisdiction over all disputes arising out of the CBA,[30] entitled the SBA to consider whether Continental gave fair consideration to the non-medical mitigating circumstances that McWhirter offered.

First, Sub-part 8(B) refers to no-notice testing, but Sub-part 8(A),[31] the provision that Continental insists is applicable, does not. Sub-part 8(B) therefore appears to be the most obvious provision to consult concerning McWhirter's refusal to be tested. Second, Sub-part 8(B) applies when a pilot "misses" a no-notice test "without a valid reason." Continental's reasoning that Sub-part 8(B) countenances only medical excuses because it only allows consideration of "valid reason[s]" is flatly contradicted by the plain text of Sub-part 8(B). Third, Continental's assertion that "misses" may not embrace a refusal to test is arguable. Continental contrasts "misses" in the second clause with "refuses or fails to cooperate" in the first clause. Rather than treating "misses . . . without a valid reason" as a reformulation of "refuses or fails to cooperate," Continental reasons that, because McWhirter refused his test but did not miss it (without a valid reason), he was required to have a medical excuse. Even if it were possible to miss a test without a valid reason without having

---

[30] "The [SBA] will have jurisdiction over disputes between any employee covered by this Agreement and the Company growing out grievances or out of the interpretation or application of any of the terms of this Agreement." CBA Section 21, Part 2(C).

[31] A pilot who refuses or fails to cooperate in any drug or alcohol test as mandated by applicable federal regulations or by this Agreement, or in any rehabilitation related testing by refusing to provide a breath or urine specimen, or a breath or urine specimen of sufficient quantity will be withheld from service without pay pending investigation. If the investigation of the refusal or failure to cooperate fails to find a valid medical reason for the pilot's refusal or failure to cooperate, or in the case of an insufficient specimen if a medical evaluation determines that there was not genuine inability to provide the required specimen, he shall be terminated.

CBA Section 15, Part 5, Sub-part 8(A).

refused or failed to cooperate with the test (at least a plausible construction, as was conceded at oral argument) McWhirter's no-notice test was "mandated . . . by this Agreement" as well, because it was ordered pursuant to an LCA entered into under the scheme of the CBA.[32] And, refusals or failures to cooperate in tests mandated by the CBA (and an LCA entered into pursuant to it) are not subject to a requirement that any excuse be "valid." Finally, even if the CBA requires that the reasons for failing to cooperate, refusing, or missing a no-notice test be "valid," it would not contradict the plain language of the parties' agreements to construe "valid reason" to embrace non-medical excuses.

Again, this construction could be "seriously wrong." For example, (1) Sub-part 8(A) might limit Sub-part 8(B) in some way, (2) the treatment of "refusals" to be tested as required "by this Agreement" and a no-notice test missed "without a valid reason" the same might be incorrect, (3) Sub-part 8(A)'s rehabilitation-related testing provisions may be the correct section on which to rely, or (4) "such mitigating circumstances" might refer to something other than being upset at the company. These possibilities are irrelevant. The SBA's construction is not so contrary to an unambiguous term that it fails to construe arguably the CBA's two sections that could address McWhirter's refusal to take a no-notice alcohol test. Sub-parts 8(A) and 8(B), and the relationship between them, admit ambiguity and multiple interpretations. As such, the SBA was free to choose among arguable constructions of them.

---

[32] This interpretation would seem to render the separate language addressing no-notice tests mere surplusage. Yet, if — as Continental urges and ALPA appears to have conceded — "misses" means something different from "refuses or fails to cooperate," then the additional no-notice testing language would not be redundant. In fact, no-notice tests would then be a subset of the tests "mandated by applicable federal regulations or by this Agreement" subject to an additional exception (when missed without a valid reason that was somehow not a refusal or failure to cooperate). In any event, it is unclear whether our canons of construction, such as the requirement that our interpretations not create redundancies, must be followed in order for a construction to be arguable.

Accordingly, the part of the SBA's decision that considered McWhirter's non-medical excuse for refusing to be tested draws its essence from the parties' agreements and was an action within its jurisdiction. Therefore, we now turn our attention to the jurisdiction of the SBA to order McWhirter's reinstatement.

b. Reinstatement

If the SBA's authority to hear disputes is to mean anything, the CBA must bestow the power to order reinstatement of a grievant. Nothing in the CBA, LCA, or practices of the parties of which we are aware precludes the SBA from asserting that power.[33] Continental nevertheless insists that once the SBA found that Continental did consider the putatively mitigating circumstances that McWhirter offered, the matter was at an end; the requirements of the CBA were satisfied. Continental contends that the SBA was therefore without authority to order reinstatement under the unambiguous language of the CBA.

That is not, however, the only arguable construction of Sub-part 8(B). The SBA could have read Sub-part 8(B) to require fair consideration. By concluding that Continental should have given more weight to the circumstances McWhirter presented, the SBA also could have concluded that Continental did not fairly consider that which McWhirter presented. By ordering reinstatement, it could have concluded that fair consideration of McWhirter's excuse would reveal no just cause for his termination.[34] If the SBA's interpretation of the CBA to permit

---

[33] To the extent that Continental Airlines, 391 F.3d at 618, appears to review less deferentially an arbitrator's decision to equate permission from a doctor's office to take a medication containing alcohol with a doctor's prescription for such medication (the latter being required by the applicable LCA), the relevant section of the LCA in that case said that failure to obtain a doctor's prescription for a substance containing alcohol constituted "a violation of this Agreement." Id. at 615. Although the LCA in the instant case makes continued employment contingent on a number of listed conditions, the relevant condition requires only that McWhirter "agree in writing to be subject to 'no notice' alcohol testing." Continental does not argue that McWhirter failed to do that. Only by referring to the CBA are the consequences of refusing to take the test when ordered clear.

[34] Unlike in American Eagle Airlines, Inc. v. Airline Pilots Ass'n, International, 343 F.3d 401, 405 (5th Cir. 2003), and Container Products, Inc. v. United Steelworkers, Local 5651, 873

non-medical mitigation evidence was within its jurisdiction, it would read the "give fair consideration" requirement out of the CBA to conclude that an order of reinstatement based on the SBA's consideration of the merits of such evidence was outside of its jurisdiction. The fact that no express provision of the CBA or LCA forbids an order of reinstatement by the SBA — indeed, several sections contemplate it[35] — means that we must defer to the SBA's interpretation of the "justiciability" of the fair-consideration requirement and the proper remedy.

Continental also argues that the plain terms of the LCA require that McWhirter be fired for refusing a no-notice test, and that those terms override any CBA requirement to consider mitigating evidence. This argument is without merit. The no-notice testing provisions of the LCA do not say that McWhirter will be terminated for refusing, missing, or failing to comply with a order to be tested. Instead, they condition McWhirter's employment on his agreement "in writing to be subject to 'no notice' alcohol testing at the direction of the Company as frequently as the Company may decide for a period of five (5) years." One construction of this language would require McWhirter's termination for refusing a no-notice test. Another interpretation would, as demonstrated above, require Continental to take account of certain mitigating factors. Even Continental, if only as a back-up argument, seems to acknowledge — as did the district court — that at the very least a valid medical excuse for refusing, missing, or failing to comply with a no-notice test would not be grounds for immediate termination without further consideration. In contrast, and as an

---

F.2d 818, 819-20 (5th Cir. 1989), the SBA in the instant case need not have made an implicit finding of just cause because the CBA provision, "give those circumstances fair consideration," can be read as part of the just-cause inquiry.

[35] Cf. CBA Section 19, Part 2(D) (describing the SBA's review as an "appeal" from a determination that just cause exists to discharge or discipline a pilot); id. Part 4(D) ("If as a result of any hearing or appeal as provided herein and in Section 21 [constituting the SBA], the grievant is reinstated . . . . ").

example of what qualifies as an "unambiguous provision," the LCA says: "Upon release by EAP to return to work, you will be required to complete a return-to-work drug and alcohol test. A positive result for any drug or alcohol test shall be cause for your immediate termination." (emphasis added). Had McWhirter tested positive on his return to work, the SBA would not have been free to order his reinstatement. The difference in the clarity of the two provisions' phrasings — the testing requirement and the consequences of a positive test — are obvious.

The CBA has better language to support Continental's position. Section 15, Part 5, Sub-part 5(D)(2)(f) provides: "If the pilot fails to comply with the provisions of the conditional reinstatement, termination will result. If the Company terminates the pilot, the only matter that may be grieved is whether or not the pilot has violated the provisions of the conditional reinstatement." On one reading, this provision would preclude the SBA from considering anything other than whether McWhirter refused the no-notice test. On another reading, particularly in pari materia with the reference to no-notice testing in Sub-part 8(B), whether McWhirter "violated the provisions of the conditional reinstatement" depends in part on the existence of mitigation (whether medical or non-medical). The conflict between Sub-part 5(D)(2)(f) and Sub-part 8(B) allows the SBA to pick any arguable construction of the two, which it did.

We repeat for emphasis: Our cases make clear that when a CBA or LCA is not unambiguous, any arguable construction by the SBA is owed deference. With this in mind, we next turn our attention to the power of the SBA to order McWhirter's continued participation in Continental's EAP.

c. The EAP Condition

The SBA's requirement that McWhirter participate in the EAP program for two years cannot be the result of an arguable construction of the LCA and CBA. The best argument in favor of the SBA's authority to order the EAP condition, which nevertheless fails even on this deferential standard of review,

is that CBA Section 15, Part 5, Sub-Part 6(A)(2) recognizes that the SBA may order no-notice alcohol testing. No-notice testing, unlike the EAP, is not committed to the discretion of the EAP director and protected by federal regulations; further, the SBA's power to order it is clear from the text. In contrast, both agreements appear to commit the length of time spent in the EAP to the discretion of its director.[36] With even clearer language, 49 C.F.R. § 40.297(a) vests sole discretion in a Department of Transportation ("DOT") accredited Substance Abuse Professional ("SAP") to make treatment evaluations of, or recommendations for assistance about, an employee who has violated DOT drug and alcohol regulations.[37] It states in relevant part:

> [N]o one (e.g., an employer, employee, a managed-care provider, any service agent) may change in any way the SAP's evaluation or recommendations for assistance. For example, a third party is not permitted to make more or less stringent a SAP's recommendation by changing the SAP's evaluation or seeking another SAP's evaluation.

There can be no dispute that the SBA qualifies as a third party and is swept into the regulation's scope by the "no one" language. There are, however, a few ambiguities around the applicability of this regulation to the subject case. For example, the title of the regulation refers only to initial evaluations by a SAP, and an initial evaluation is not at issue here. Next, even though the plain language of § 40.297(a) is not limited to an initial evaluation, it is limited to "the SAP's evaluation or recommendations for assistance."

---

[36] See, e.g., CBA Section 15, Part 5, Sub-part 5(D)(2)(b) ("[T]he pilot must successfully complete the course of rehabilitation recommended by Continental's EAP . . . . The rehabilitation will be directed and facilitated by Continental's EAP . . . ."). The LCA provides: "As a condition of continuing employment, you agree to undergo evaluation by the [EAP] Director . . . and to complete any rehabilitation recommended by EAP . . . ." (emphasis added).

[37] These regulations apply to employees who participate in DOT safety-sensitive duties. See 49 U.S.C. § 45102 (2006). Airline pilots are DOT safety-sensitive employees. See id.

There may be an argument that the SBA order does not alter a recommendation or evaluation. For example, McWhirter argues that the EAP condition simply requires that, in addition to whatever else McWhirter's compliance with the LCA (and so the EAP) might require of him, he must stay in the EAP for at least two years. If, however, the SAP were to recommend that McWhirter be released before two years, that would be an "evaluation or recommendation," and the SBA's order would interfere with that decision by the SAP. Further, the plain language of the regulation says that "a third party is not permitted to make more or less stringent a SAP's recommendation." Only if Continental's SAP should decide independently that McWhirter must remain in the program for two additional years would the SBA's order not "change in any way the SAP's evaluation."

We cannot see how interfering with a SAP's recommendation to discharge McWhirter from the EAP before two years would not serve the purposes of the DOT regulations governing the return to work of safety-sensitive employees. After all, that would be forcing more treatment and longer observation than the DOT regulations require. Further, McWhirter does not challenge this provision of the SBA's order or ask to be relieved of additional EAP participation, and he is the party that the regulation is likely intended to protect by its prohibition against more stringent recommendations for assistance. Continental nevertheless urges that we reverse this condition, and the plain terms of § 40.297(a) do not countenance any interference with a SAP's evaluations or recommendations, even if that interference results in "more . . . stringent" conditions.

Having established that an applicable federal regulation does not permit the SBA to interfere with a SAP's treatment recommendation, Continental urges that the SBA cannot issue a decision in contravention of that regulation and claim that the decision draws its essence from the CBA; the CBA by its terms

purports to be in compliance with federal regulations.[38]  In reply, McWhirter points out that interference with a SAP's discretion does nothing more than take McWhirter's rehabilitation out of compliance with the DOT's return-to-work provisions.  Under the regulations cited by Continental, there does not appear to be a reason why the company could not do as it wished with McWhirter's EAP participation.  If McWhirter is to be returned to safety-sensitive work, e.g., flying, the DOT regulations must be observed.[39]  The inverse is not obviously untrue, and Continental has not invited our attention to anything in the CBA, LCA, or DOT regulations that requires it to assign McWhirter to safety-sensitive tasks.

Nevertheless, to permit the SBA to order McWhirter to participate in the EAP for two more years — forcing Continental to enroll McWhirter in the EAP for that duration regardless of the SAP's professional opinion — comes so close to directly contravening a controlling federal air-safety regulation that, if such a decision were not outside of the SBA's jurisdiction, it would be a violation of public policy.  We hold that by vesting the EAP director with the discretion to prescribe McWhirter's course of treatment, the CBA and LCA cannot be construed to vest that power in the SBA.  United Paperworkers International Union v. Misco, Inc.,[40] teaches that the proper remedy in this case is a vacatur of the EAP condition and remand for further proceedings, and this is what we order.

---

[38]  See, e.g., CBA Section 15, Part 5, Sub-part 1 ("All pilots will be subject to drug and/or alcohol testing to the extent required by applicable federal regulations . . . .").

[39] See CBA Section 15, Part 5, Sub-part 9(E) ("Nothing in this Section shall be construed to require the Company to utilize or compensate a pilot who is not fully licensed and certified to perform revenue flying for the Company.").

[40]  484 U.S. 29, 40 n.10 (1987).

We have been presented with no reason — and are aware of none — why on remand the SBA is prevented from ordering McWhirter to comply with whatever period of additional EAP participation Continental's SAP might recommend. Section 40.297(a) speaks only to the impermissibility of "chang[ing] in any way the SAP's evaluation or recommendations for assistance." Accordingly, the SBA is free on remand to order McWhirter to comply with the SAP's recommendations for assistance.

B.    Public Policy

McWhirter's second contention is that his reinstatement and the EAP condition do not violate public policy. Continental contends that the district court correctly concluded that concerns about air-traffic safety compel reversal of the SBA's reinstatement order and the EAP condition.

We concluded above that the SBA exceeded its jurisdiction by ordering McWhirter's continued EAP participation. The correct remedy for that error is to vacate the EAP condition and to remand rather than reverse. But, if reversal, rather than vacatur, of any EAP-like condition is required for reasons of public policy, we could prevent two unnecessary remands by resolving the question now. Therefore, in the interests of judicial economy, we address Continental's objections to any EAP condition on public policy grounds.[41] We address the reinstatement order and the EAP condition in turn.

1.    Standard of Review

---

[41]    See C&B Sales & Serv., Inc. v. McDonald, 177 F.3d 384, 389 (5th Cir. 1999). Otherwise, we would have to remand to the district court to remand to the SBA to determine whether a new EAP condition is warranted. The district court would then have to address Continental's public policy objections to any EAP condition if they were re-urged. We are in just as good of a position as the district court to reach this issue. We therefore exercise our discretion to do so.

As with the district court's resolution of Continental's RLA claim, we review de novo its grant of summary judgment on the basis of public policy.[42]

2.     Applicable Law

To understand the result that we must reach in this case, a healthy dose of background is necessary.  The most recent incarnation of the public policy exception for arbitration awards began with the Supreme Court's Labor Management Relations Act (the "LMRA") case, W.R. Grace & Co. v. Local Union 759, International Union of United Rubber, Cork, Linoleum & Plastic Workers.[43] There, the company was in an awkward position:  It could either follow the mandate of a district court to obey a conciliation agreement in a sex-discrimination case, risking liability for breaching the CBA as interpreted by the arbitrator, or avoid liability under the CBA by flouting the mandate of the district court, risking Title VII liability and contempt.  The company claimed that the arbitrator's award violated public policy by creating an incentive to disobey the district court's order and by chilling voluntary compliance with Title VII through the EEOC conciliation process.  The Court first established that such claims are cognizable, saying that "[i]f the contract as interpreted by [the arbitrator] violates some explicit public policy, we are obliged to refrain from enforcing it."[44]  The Court next claimed for the judiciary, not the arbitrator, the power to determine questions of public policy.[45]  The theory behind this non-LMRA (and non-RLA) exception to deference is the same as for the refusal of courts to enforce any contract that violates public policy:  A court will not assist

---

[42] See Cont'l Airlines, Inc. v. Int'l Bhd. of Teamsters, 391 F.3d 613, 616 (5th Cir. 2004).

[43]  461 U.S. 757, 766-69 (1983).

[44]  Id. at 766.

[45]  Id.

a party's violation of public policy by using its powers to enforce an agreement contrary to the public interest.[46]

The limiting portions of the opinion, however, have proved to be much more important. The Court took a very narrow view of the public policy exception, and, even though it acknowledged the catch-22 in which the company found itself, the Court held that the arbitrator's award did not violate public policy, observing that "public policy . . . must be well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests."[47] The potential liability of the company for violating the CBA by complying with the district court's order did not implicate public policy as thus defined.

Cases in the circuits after W.R. Grace employed the public policy exception somewhat liberally to strike down arbitrators' decisions that reinstated safety-sensitive employees who had abused drugs or alcohol.[48] For example, in Amalgamated Meat Cutters & Butcher Workmen, Local Union 540 v. Great Western Food Co., we said: "In a nation where motorists practically live on the highways, no citation of authority is required to establish that an arbitration

---

[46] Id. ("As with any contract, however, a court may not enforce a collective bargaining agreement that is contrary to public policy.").

[47] Id. (internal quotation marks omitted).

[48] E.g., Delta Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l., 861 F.2d 665, 666-68, 674 (11th Cir. 1988) (affirming the reversal of an arbitration award's reinstatement of a pilot who flew while drunk); Amalg. Meat Cutters & Butcher Workmen, Local Union 540 v. Great W. Food Co., 712 F.2d 122, 125 (5th Cir. 1983) (reversing enforcement of an award to reinstate a truck driver who drank on duty); NLRB v. Dixie Motor Coach Corp., 128 F.2d 201, 203 (5th Cir. 1942) (permitting, pre-W.R. Grace, a company's discharge of a bus driver who drank while working his route). But see Oil, Chem. & Atomic Workers, Int'l Union, Local No. 4-228 v. Union Oil Co. of Cal., 818 F.2d 437, 441-43 (5th Cir. 1987) (holding that an arbitrator's award reinstating an oil refinery worker who used drugs off-site was not against public policy at the time it was issued, before new drug problems cropped up, but remanding for reconsideration in light of the further drug use).

award ordering a company to reinstate an over-the-road truck driver caught drinking liquor on duty violates public policy."[49]

One case in particular is instructive. In Misco, Inc. v. United Paperworkers International Union, we concluded that an order reinstating a safety-sensitive manufacturing employee who was caught smoking marijuana in his car in the plant's parking lot violated public policy.[50] The Supreme Court, however, would have none of it. Reversing us, it said:

> As we see it, the formulation of public policy set out by the Court of Appeals did not comply with [W.R. Grace] . . . . The Court of Appeals made no attempt to review existing laws and legal precedents in order to demonstrate that they establish a well-defined and dominant policy against the operation of dangerous machinery while under the influence of drugs. Although certainly such a judgment is firmly rooted in common sense, we explicitly held in W.R. Grace that a formulation of public policy based only on general considerations of supposed public interests is not the sort that permits a court to set aside an arbitration award that was entered in accordance with a valid collective-bargaining agreement.[51]

Several portions of the Misco opinion are instructive. First, the Supreme Court invigorated W.R. Grace's requirement that an SBA decision, not the underlying conduct of the grievant, must violate "some explicit public policy that is well defined and dominant, and [that] is . . . ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests."[52] Second, lest there be any doubt, the Court cautioned that "it is apparent that [W.R. Grace] . . . does not otherwise sanction a broad judicial

---

[49] 712 F.2d at 124.

[50] 768 F.2d 739, 742 (5th Cir. 1985), rev'd, 484 U.S. 29, 43 (1987).

[51] Misco, 484 U.S. at 44 (internal quotation marks and citations omitted).

[52] Id. at 43 (internal quotation marks omitted).

power to set aside arbitration awards as against public policy."[53]  Third, the Court pronounced that

> [t]o conclude from the fact that marijuana had been found in Cooper's car that Cooper had ever been or would be under the influence of marijuana while he was on the job and operating dangerous machinery is an exercise in factfinding about Cooper's use of drugs[,] . . . a task that exceeds the authority of a court asked to overturn an arbitration award.  The parties did not bargain for the facts to be found by a court.[54]

Finally, the Court noted that "[t]he issue of safety in the workplace is a commonplace issue for arbitrators to consider in discharge cases, and it was a matter for the arbitrator in the first instance to decide whether Cooper's alleged use of drugs on the job would actually pose a danger."[55]

Undeterred by these remonstrations, we took up the challenge of satisfying W.R. Grace, and, after Misco, we have refused to enforce at least two arbitration awards reinstating a safety-sensitive employee discharged for drug or alcohol abuse.[56]  Subsequently, however, the Supreme Court has again addressed the issue.  In Eastern Associated Coal Corp. v. United Mine Workers of America,[57] the Fourth Circuit had concluded that an arbitration award that reinstated a DOT safety-sensitive employee who had failed a drug test (while under an analogue of an LCA because he had previously tested positive for drugs) violated public policy.  The Supreme Court reversed, saying:

---

[53]  Id.

[54]  Id. at 44-45.

[55]  Id. at 45 n.11.

[56]  Exxon Corp. v. Baton Rouge Oil & Chem. Workers Union, 77 F.3d 850, 856-57 (5th Cir. 1996) (reversing an arbitrator's reinstatement of a chemical plant supervisor who tested positive for cocaine while employed in a safety-sensitive job); Gulf Coast Indus. Workers Union v. Exxon Co., U.S.A., 991 F.2d 244, 250 (5th Cir. 1993) (reversing reinstatement of an employee who used cocaine while employed in a safety-sensitive position)

[57]  531 U.S. 57, 67 (2000).

Regarding drug use by persons in safety-sensitive positions, then, Congress has enacted a detailed statute . . . [and] [n]either Congress nor the Secretary [who issued rules under the statute] has seen fit to mandate the discharge of a worker who twice tests positive for drugs. We hesitate to infer public policy in this area that goes beyond the careful and detailed scheme Congress and the Secretary have created.

We recognize that reasonable people can differ as to whether reinstatement or discharge is the more appropriate remedy here. But both employer and union have agreed to entrust this remedial decision to an arbitrator. We cannot find in the Act, the regulations, or any other law or legal precedent an "explicit," "well defined," "dominant" public policy to which the arbitrator's decision [to reinstate a drug user] "runs contrary."[58]

Several important principles emerge from Eastern Associated Coal. First, an SBA decision might in theory violate public policy without directly contravening positive law, but "the public policy exception is narrow and must satisfy the principles set forth" that require, at a minimum, reference to applicable laws and legal precedents.[59] Second, courts should be particularly chary when divining public policy from some laws, for example, those in which "two political branches have created a detailed regulatory regime in a specific field."[60] Finally, the Court pronounced that

[t]he award violates no specific provision of any law or regulation. It is consistent with DOT rules requiring completion of substance-abuse treatment before returning to work, for it does not preclude Eastern from assigning Smith to a non-safety-sensitive position until Smith completes the prescribed treatment program. It is consistent with the Testing Act's 1-year and 10-year driving license suspension requirements, for those requirements apply only to drivers who, unlike Smith, actually operated vehicles under the influence of drugs. The award is also consistent with the Act's

---

[58] Id.

[59] Id. at 63; see Weber Aircraft Inc. v. Gen. Warehousemen & Helpers Union Local 767, 253 F.3d 821, 826 (5th Cir. 2001).

[60] E. Associated Coal, 531 U.S. at 63.

25

rehabilitative concerns, for it requires substance-abuse treatment and testing before Smith can return to work.

      The fact that Smith is a recidivist — that he has failed drug tests twice — is not sufficient to tip the balance in Eastern's favor.[61]

Continental has cited no cases after Eastern Associated Coal, nor are we aware of any, in which we have set aside an arbitration award on the grounds of public policy implicated by reinstating a safety-sensitive employee who habitually abuses drugs or alcohol. As this saga demonstrates, we and other circuits have repeatedly attempted to protect what seems to us a common sense notion of public safety: DOT safety-sensitive employees who habitually abuse drugs or alcohol should not be reinstated by arbitrators. In measure equal to the vigor that courts of appeal have applied to reversing awards of reinstatement, the Supreme Court has reversed. Our ability to set aside decisions like that of the SBA in this case is severely circumscribed. It is with this overarching limitation firmly in mind that we now examine that award and the applicable regulations.

3. Analysis

a. Reinstatement

Continental has identified no positive law that expressly precludes McWhirter's reinstatement to non-flying status. Yet it does cite a number of different FAA and DOT provisions that embody a strong public policy against alcohol abuse by pilots and a strong public policy in favor of Continental's protecting air-traffic safety.[62] We therefore must consider whether that positive law establishes a sufficiently "explicit," "defined," and "dominant" public policy.

We assume without deciding that if a public policy is "explicit" and "defined" in this case, it is dominant. The problem with Continental's position

---

[61] Id. at 66 (internal citations omitted) (emphasis added).

[62] See, e.g. 49 U.S.C. § 44701(d)(1)(A) (2006); 49 C.F.R. § 40.291(b) (2008); 14 C.F.R. pt. 121, app. J, § V(A) (2008).

is that we perceive no sufficiently "explicit" and "defined" policy against McWhirter's reinstatement. One "explicit" and "defined" public policy that we identify from our cases, although Eastern Associated Coal calls it into question, is a prohibition against reinstating employees who engage in substance abuse while actually performing a safety-sensitive task. The cases on which Continental relies establish only that,[63] because they involve almost exclusively employees caught on work sites with drugs in their system (although whether the employees were actually at work under the influence is not clear in every case). Further, our opinion that rejected a public policy rationale for declining to enforce an arbitrator's award of reinstatement focused on the fact that the employee's drug use prior to the arbitration (different issues were presented by possible drug use subsequent to that arbitration) had occurred off-site and was unlikely to hinder her job performance.[64]

Even if we assume that McWhirter had been drinking when he refused the no-notice test, an assumption called into question by the negative test a month earlier, there is absolutely no evidence that he was discharged for drinking while engaged in a safety-sensitive task. In fact, he could not have been — he was on leave and lacked the requisite credentials to fly an aircraft. Reinstating McWhirter, even though he almost flew after drinking (the incident that resulted in the LCA), does not fall within this narrow category of cases that precludes enforcement of a reinstatement order for an employee who engaged in substance abuse while actually engaged in a safety-sensitive task, not least of all because McWhirter was not discharged for that, but for refusing a test.

Next, we consider whether a refusal to be tested is equivalent to being drunk or stoned on the job. It appears that it is not. The CBA denies an LCA

---

[63] See cases cited supra notes 48 and 56.

[64] Oil, Chem. & Atomic Workers, Int'l Union, Local No. 4-228 v. Union Oil Co. of Cal., 818 F.2d 437, 441-43 (5th Cir. 1987).

arrangement to pilots who are discovered to be under the influence while engaged in safety-sensitive tasks. The same is not true for other violations of the CBA's drug and alcohol policy, such as a refusal to be tested. It thus appears that even the parties' agreement recognizes a difference between actually being impaired at work and refusing to be tested. Further, Continental claims that the no-notice test that McWhirter refused was "not mandated by FAA regulations. Rather, it was directed by the SAP and implemented by Continental." The failure of the FAA and DOT to mandate the test that McWhirter refused is an indication that Continental is accorded wide latitude in designing testing practices. If Continental need not have ordered this particular test as a matter of positive law, it is unclear how McWhirter's refusal to be tested contravenes an "explicit" and "defined" public policy flowing from positive law. As Continental's discretion to protect air-traffic safety increases, the definition of any public policy emerging out of that general concern decreases.

We next consider Continental's contention that because McWhirter could resume flying if the SBA decision stands, public policy is implicated. Based on our review of the FAA and DOT return-to-work provisions, it does appear that McWhirter could someday fly an aircraft again.[65] That is true, however, whether or not Continental continues to employ him. Misco requires that the arbitration award, not the underlying conduct of the grievant or actions of third parties (such as the possibility that the FAA and DOT might one day clear McWhirter to fly again), violate public policy. Even were that not the case, we would be engaging in an "exercise in factfinding" that the Misco Court prohibited if we

---

[65] Both parties have attempted to cloud this issue. McWhirter focuses excessively on the fact that the award only reinstates him to non-flying status, ignoring the obvious fact that he could seek medical clearance from the FAA to fly again. Continental engages in histrionics by claiming that McWhirter could pilot a commercial aircraft tomorrow if the SBA decision stands. Instead, it appears that the FAA, after a review of the entirety of McWhirter's medical history, including his history of alcohol dependence, could grant him the certifications he needs to fly. He would be required to complete the FAA and DOT return-to-work process.

were to attempt to discern the relative probabilities that McWhirter will fly again, with or without reinstatement, and the probability that he would do so in a way that implicates public policy (e.g., while under the influence).[66] "[I]t was a matter for the arbitrator in the first instance to decide whether" McWhirter's refusal to be tested "would actually pose a danger."[67]

Finally, if we nevertheless assume that the arbitration award itself plays some additional role in risking air-traffic safety, Continental fundamentally misapprehends Misco and Eastern Associated Coal: The absence of FAA and DOT regulations that preclude McWhirter from flying again actually cuts in favor of McWhirter. We quote those cases again. Misco said: "Although certainly such a judgment [that operation of dangerous machinery while under the influence of drugs] is firmly rooted in common sense, we explicitly held in W.R. Grace that a formulation of public policy based only on general considerations of supposed public interests is not the sort that" suffices to set aside an arbitration award.[68] Eastern Associated Coal said: "Neither Congress nor the Secretary has seen fit to mandate the discharge of a worker who twice tests positive for drugs. We hesitate to infer a public policy in this area that goes beyond the careful and detailed scheme Congress and the Secretary have created."[69]

The Supreme Court has essentially concluded that, except in some difficult-to-imagine example, if the FAA and DOT can someday be satisfied with a pilot's fitness to fly, it is not our job to meddle. Whether McWhirter might one day satisfy the FAA and DOT that he is again qualified to fly is therefore not our

---

[66] See United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 44-45 (1987).

[67] Id. at 45 n.11.

[68] Id. at 44 (internal quotation marks omitted).

[69] 531 U.S. 57, 67 (2000).

29

concern. If it ever was, the Supreme Court divested of us of it in Eastern Associated Coal and entrusted it to Congress and the Executive in the person of the Secretary of Transportation. Continental's independent duties to protect air-traffic safety, which it so forcefully urges on us as a reason not to permit McWhirter's reinstatement, are yet another replacement for the bulwark — against the specter of a pilot flying while drunk — that we cannot be.

Even if we have misread the CBA and Continental, despite a conviction that he poses a threat to air-traffic safety, would be contractually required to permit McWhirter to fly if he is cleared by the FAA and DOT, Continental would be in essentially the same catch-22 as the company in W.R. Grace. It could escape contractual liability only by contravening its independent duty to protect air-traffic safety. In W.R. Grace, the Court refused to say that a choice between contempt and contractual liability (forced by the arbitrator's decision) violated public policy. For the same reason, if McWhirter is re-certified to fly and Continental faces a choice between some CBA-mandated contractual obligation to permit McWhirter to fly versus public safety, we cannot say that forcing Continental to choose contractual liability so disincentivizes it to comply with federal regulations that this reinstatement order violates public policy.

b. The EAP Condition

The public policy analysis and the RLA analysis are essentially the same for the EAP condition in this case. For the same reasons that an SBA order that very likely violates federal regulations cannot be a valid construction of the CBA and LCA, such an order violates public policy. In fact, the public policy rationale for vacating the EAP condition is even stronger, because we perceive an "explicit" and "defined" policy against interference with the professional discretion of the SAP in 49 C.F.R. § 40.297(a), justified by the need for objective and professional treatment of substance abuse in safety-sensitive employees, that extends beyond the literal terms of the regulation. Accordingly, on a public

policy analysis, we need not concern ourselves with hypertechnical possibilities (such as a hypothetical concordance between the EAP participation ordered by the SBA and the SAP's recommendation or the necessity of complying with this regulation if McWhirter is not to be re-assigned to safety-sensitive tasks), although we still must ground our decision in references to positive law and its "explicit" and "defined" policies. Section 40.297(a) says as clearly as it can that only a SAP may have anything to do with the substance abuse assistance recommended for a safety-sensitive employee.

What § 40.297(a) does not preclude, by its terms or in the policy we perceive as motivating it, is an SBA order that an employee comply with whatever treatment, assistance, program, or conditions a SAP recommends. Accordingly, the SBA is free on remand to order such compliance as a condition of its reinstatement order. It may not, however, prescribe a minimum or maximum amount of time in the EAP.

## III. CONCLUSION

We take no comfort in enforcing an SBA order that reinstates a pilot who has refused to comply — simply because he was "upset" — with no-notice alcohol testing after he was diagnosed with alcohol dependence and entered into an LCA that mandated no-notice testing. We are even more discomforted that we must vacate the one portion of the SBA's order that seems to reflect a compromise in favor of air-traffic safety. But, just as we cannot torture the RLA standards of review, and just as we cannot embrace public policy as an end-run around RLA deference, we cannot sanction even Solomonic "industrial justice" that comes perilously close to direct conflict with federal regulations and is not a supportable construction of the parties' agreements.

Therefore, the judgment of the district court reversing the SBA's order of reinstatement is REVERSED, and this case is REMANDED with instructions to VACATE so much of the SBA's order as requires McWhirter's continued

participation in Continental's EAP and for other proceedings consistent with this opinion, such as remand to the SBA for further consideration of any conditions that should be imposed on McWhirter's reinstatement. To be clear, we perceive no infirmity with the SBA's reinstatement order, which should be enforced after further SBA proceedings have concluded.

REVERSED and REMANDED with instructions.